**CHAPMAN AND COLE, et al., Plaintiffs,**

v.

**ITEL CONTAINER INTERNATIONAL B. V., Defendant.**

Civ. A. No. H–83–5945.

United States District Court,
S.D. Texas,
Houston Division.

July 17, 1987.

See also 116 F.R.D. 550.

J. Douglas Sutter, Ross, Griggs & Harrison, Houston, Tex., for plaintiffs.

Edward D. Urquhart, Urquhart & Hassell, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGLETON, Chief Judge.

### A.  Introduction

This action arose over a commercial lease entered between the plaintiff, Chapman & Cole, and the defendant, Itel container (hereinafter "Itel").  After extensive discovery, this case was tried before this Court during a bench trial that lasted seven-days.  As a preface to these findings and conclusions, this Court feels compelled to make the following observations.

As this Court noted on April 6, 1987, just prior to the commencement of this trial, it was painfully clear to the outside observer that this case involved little more than a straightforward action for breach of contract.  Plaintiff alleged that the defendant had breached the standard lease agreement by failing to pay rent and properly maintain the premises.  The defendant's defense and counterclaim was simply that plaintiff had failed to adequately design and construct the container yard.  What the case ultimately transgressed into, however, was a costly, drawn-out legal battle involving unfounded allegations, baseless

counter claims, and senseless "mud-slinging." This resulted in excessive trial time, costly and useless discovery, lawyer bickering and all in all, the type of litigation that irritates judges and brings lawyers into public disrepute. This Court will address the consequences of defendant's attorney's litigation tactics in a separate Memorandum and Order regarding the Motions for Sanctions filed in this action.

In addition, this Court has the following observations regarding the defendant, Itel Container. This Court finds it difficult to comprehend how the management at Itel could have entered into this type of lease agreement without protecting the interests of its shareholders by providing its own supervision and mandating constant testing at the construction site. The facts clearly show that the management at Itel entered this agreement knowing that Chapman & Cole had never before constructed a container yard. Itel, on the other hand, had operated several container yards in other locations. It had untold amounts of experience in the container business and certainly possessed the knowledge and wherewithal to prevent the types of problems experienced in this case from ever occurring. Itel's problems were further compounded when its management made the cavalier decision to walk away from its ten-year lease obligation after less than a year had expired from the term. An inference can be drawn, from the evidence, that this decision was made solely because a change in the tax laws indicated to the management at Itel that the type of lease agreement entered into with Chapman & Cole would no longer be profitable. Therefore, a conscious decision was made by Itel's management to abandon the lease premises. Apparently, Itel's management believed that a company the size of Chapman & Cole would not attempt a lawsuit against a corporation the size of Itel whose vast and superior resources would permit it to contest such litigation in a manner that would make it so costly that Chapman & Cole would be forced to give up without a fight. Further, during the trial it became apparent through the testimony of Itel's in-house counsel that Itel's management condoned and encouraged the litigation tactics employed by its local counsel. Itel's Management apparently believed that such litigation tactics would enable it to prevail at trial. As these findings of fact and conclusions of law will show, however, in this particular instance Itel's Management could not have been more misguided in its beliefs.

## FINDINGS OF FACT

1. The Plaintiffs, Chapman & Cole and C.C.P., Ltd. (hereinafter referred to collectively as "Chapman & Cole") are Texas partnerships and/or Texas business entities doing business in Texas. Chapman & Cole are investment builders.

2. The Defendants, Itel Container International B.V. and Itel Container Corporation (hereinafter referred to collectively as "Itel") are foreign corporations doing business in the State of Texas and this jurisdiction. Itel is a multinational corporation which deals primarily with the ownership, leasing, storage and movement of steel and aluminum ocean-going/rail/truck containers. These containers come in two sizes generally, 40 feet and 20 feet and weigh from 4,000 to 10,000 pounds. Itel is the fourth largest container company in the world. Itel utilizes various container yards in the United States in addition to several abroad. The yards located in the United States are in Chicago, Detroit, Houston, Los Angeles, Memphis, Oakland, Portland, and Seattle. Itel maintains offices in Copenhagen, Genoa, Hamburg, Hong Kong, London, Paris, Rotterdam, Singapore, Sidney, Tokoyo and San Francisco.

3. During late 1979 and early 1980, Itel instructed two of its officers, Allen Goldade and William Tsonis to locate, design and develop a container yard to be used exclusively by Itel in Houston, Texas. Mr. Goldade was in charge of marketing for Itel in North America. Mr. Goldade had lived in Houston since 1972 and had worked for Itel during all times material hereto.

4. During late 1979 and early 1980, Itel enlisted the assistance of a real estate agent/broker, Coldwell Banker, Incorporat-

ed. Itel instructed Coldwell Banker to locate several investment builders to assist in the location of a site for the container yard in Houston, Texas. Coldwell Banker was Itel's agent and held itself out to the public as Itel's agent.

5. Coldwell Banker, on behalf of Itel, contacted Chapman & Cole, an investment builder in Houston, Texas to assist in the development and construction of the facility.

6. During early 1980, approximately 10 acres of land on Old Beaumont Highway in Houston was located as the prospective site for the Itel facility. Chapman & Cole was to purchase the property, develop same for Itel and lease it back to Itel. Pursuant to this arrangement, Chapman & Cole purchased the 10 acre site.

7. Chapman & Cole referred Itel's Mr. Goldade and Mr. Tsonis to Mr. Robert Treat, a "dirt/surface contractor" and to Mr. John Montgomery, an architect. The Itel representatives met with both Mr. Treat and Mr. Montgomery on numerous occasions to plan, develop and design the facility.

8. Both Mr. Goldade and Itel were knowledgeable of the various types of container yards in the Houston, Texas area, the weather conditions in Houston, Texas and the type of equipment which is normally utilized on container yards.

9. Mr. Goldade, Mr. Tsonsis and Mr. Robert Treat worked out details for the design of a flexible surface for the 10 acre container yard. Mr. Goldade and Mr. John Montgomery worked on the layout and the architectural drawings for the plans of the site.

10. Before meeting Chapman & Cole in early 1980, and during initial meetings with Chapman & Cole, Itel explored the possibilities of various materials which could be utilized in a flexible surface, i.e., flue dust, mackadoo, limestone, gravel and other types of materials. Mr. Goldade and Mr. Tsonis agreed with Mr. Treat's recommendation for the materials to be used in the flexible surface, i.e., flue dust, limestone, and select fill. During the initial planning stages of the design of the yard, Itel made various changes in the quantities of the material to be used on the site. Initially, Mr. Treat and Chapman & Cole suggested that there be placed on the site eight to ten inches of steel reinforced concrete. Itel would not agree to such construction because of the additional cost and agreed upon the type of material stated above. In addition, Itel changed the quantities of the material, from six inches of limestone to three inches of limestone to adjust the cost of the construction of the facility downwards.

11. During the first meeting between Itel and Chapman & Cole in early 1980, Howard Chapman of Chapman & Cole and Mr. Robert Treat of Hammond-Treat advised the Itel representatives that they had never constructed a container yard. Notwithstanding these advices, the Itel representatives selected Chapman & Cole as the investment builder and approved Hammond-Treat, Mr. Treat's company, as the subcontractor to perform the site work on the yard.

12. Mr. Goldade and Mr. Tsonis represented Itel during the selection, design, construction and operation of the facility located on Old Beaumont Highway in Houston.

13. Pursuant to the arrangement between Itel and Chapman & Cole, Chapman & Cole was to purchase the property for the site, develop the site pursuant to the plans and specifications approved by Itel, and was to lease the site back to Itel on a ten year lease. The cost of the construction of the site, the cost of the acquisition of the land and other miscellaneous expenses all determined the monthly rental of the yard. Pursuant to the arrangement, Itel would have an option to purchase the property at the end of the lease. Chapman & Cole acquired the land and hired the subcontractors to develop the property pursuant to the plans and specifications approved by Itel and as noted hereinabove.

14. In June, 1980, Itel's agent, Coldwell Banker, prepared a Standard Industrial/Commercial Lease to be signed by both Itel, as Lessee and Chapman & Cole, as

Lessor. The date of the commencement of the Lease was to be agreed upon by the parties by way of a written addendum after the site was constructed. The Lease Contract was signed on or about June 20, 1980, by Mr. Gordon Player, an officer of Itel and Mr. Howard Chapman on behalf of Chapman & Cole. The monthly rental agreed upon by the parties for the ten (10) year term was $11,101.67.

15. The Lease Contract signed by the parties on or about June 20, 1980 is the only written agreement between the parties. The Lease Contract was stipulated to by both parties and admitted into evidence. The terms and provisions of the Lease Contract are clear and unambivalent. The Lease Contract was uncontroverted and uncontested at trial by all parties.

16. During the initial design and planning stages of the facility, Itel's representatives advised both Mr. Howard Chapman and Mr. Robert Treat of the weights of the equipment to be utilized on the yard. Both Mr. Treat and Mr. Chapman were advised that the maximum amount of weight to be utilized on the yard would be 30,000 lbs., to-wit: a 20,000 forklift and a 10,000 lb. container. The weight of the equipment was important as the yard was to be constructed to withstand that designed weight. Itel advised Mr. Robert Treat that they wanted him to construct a yard similar to the Magnolia truck yard located in Houston, a yard that Mr. Treat had constructed several years before. Further, Itel representatives advised Mr. Treat and Mr. Chapman that the containers would be stacked on timber rails so as to allow for proper drainage on the crowded site and so as to allow for the tynes of the forklifts to pick up the containers without violating or penetrating the three inch limestone flexible surface. Pursuant to these advices, the flexible surface was constructed on the yard.

17. The contract signed between the parties was eventually amended to state that the commencement date of the Lease Contract would be February 1, 1981. The Lease Contract was to be effective through January 31, 1991. The more pertinent parts of the Lease Contract are as follow:

6.3 *Condition of Premises* Except as provided in paragraph 6.2(a) Lessee hereby accepts the premises in their condition existing as of the date of the execution hereof, subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the premises, and accepts this lease subject thereto and to all matters disclosed thereby and by any exhibits attached hereto. Lessee acknowledges that neither lessor nor lessor's agent has made any representation or warranty as to the suitability of the premises for the conduct of lessee's business.

7.1 *Lessee's Obligations* Lessee shall keep in good order, condition and repair the premises and every part thereof, structural and nonstructural (whether or not such portion of the premises requiring repair, or the means of repairing the same are reasonably or readily accessible to lessee, and whether or not the need for such repairs occurs as a result of lessee's use, any prior use, the elements or the age of such portion of the premises) ...

7.2 *Surrender* On the last day of the term hereof, or on any sooner termination, lessee shall surrender the premises to lessor in the same condition as when received, broom clean, ordinary wear and tear excepted. Lessee shall repair any damage to the premises occasioned by the removal of lessee's trade fixtures, furnishings and equipment pursuant to paragraph 7.5(d), which repair shall include the patching and filling of holes and repair of structural damage.

8.1 *Insuring Party* As used in this paragraph 8, the term "insuring party" shall mean the party who has the obligation to obtain the property insurance required hereunder. The insuring party shall be designated in paragraph 16.26 hereof....

16.26 *Insuring Party* The insuring party under this lease shall be *Lessee*.

8.7 *Exemption of Lessor From Liability* Lessee hereby agrees that Lessor

shall not be liable for injury to Lessee's business or any loss of income therefrom or for damages to the goods, wares, merchandise or other property of Lessee ... whether the said damage or injury results from conditions arising upon the premises or upon other portions of the building of which the premises are a part, or from other sources or places, and regardless of whether the cause of such damage or injury or the means of repairing the same is inaccessible to Lessee....

9.1 *Partial Damage—Insured* .... if the Lessee is the insuring party, and if the insurance proceeds received by Lessor are not sufficient to effect such repair, Lessor shall give notice to Lessee of the amount required in addition to the insurance proceeds to effect such repair....

10.1 *Payment of Taxes* Lessee shall pay all real property taxes applicable to the premises during the term of this lease. ... If Lessee shall fail to pay any such taxes, Lessor shall have the right to pay the same, in which case Lessee shall repay such amount to Lessor with Lessee's next rent installment together with interest at the rate of 10% per annum.

13.1 *Defaults* The occurrence of any one or more of the following events shall constitute a material default and breach of this Lease by Lessee:

(a) The vacating or abandonment of the Premises by Lessee.

(b) The failure by Lessee to make any payment of rent or any other payment required to be made by Lessee hereunder ...

(c) The failure by lessee to observe or perform any of the covenants, conditions or provisions of this lease ...

13.2 *Remedies* In the event of any such material default or breach by Lessee, Lessor may at any time thereafter, with or without notice or demand and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such default or breach:

(a) Terminate Lessee's right to possession of the premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession of the premises to Lessor. In such event Lessor shall be entitled to recover from Lessee all damages incurred by Lessor by reason of Lessee's default including, but not limited to, the cost of recovering possession of the premises; expenses of reletting, including necessary renovation and alteration of the premises, reasonable attorney's fees, and any real estate commission actually paid; the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid rent for the balance of the term after the time of such award exceeds the amount of such rental loss for the same period that Lessee proves could be reasonably avoided; that portion of the leasing commission paid by Lessor pursuant to paragrah 15 applicable to the unexpired term of this Lease.

\* \* \* \* \* \*

(c) Pursue any other remedy now or hereafter available to Lessor under the laws or judicial decisions of the State in which the premises are located.

16.4 *Interest on Past-due Obligations* Except as expressly herein provided, any amount due Lessor not paid when due shall bear interest at 10% per annum from the date due. Payment of such interest shall not excuse or cure any default by Lessee under this lease, provided, however, that interest shall not be payable on late charges incurred by Lessee nor on any amounts upon which late charges are paid by Lessee.

16.6 *Attorney's Fees* If either party or the broker named herein brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, on trial or appeal, shall be entitled to his reasonable attorney's fees to be paid by the losing party as fixed by the Court. The provisions of this paragraph shall inure to the benefit of the broker named herein who seeks to enforce a right hereunder.

In addition, there was a written addendum attached to and made a part of the original contract which stated in Paragraph 4 that plans of the site signed by the Lessor and Lessee would acknowledge the approval of the plans for the site by Itel. The plans of the site as reflected in Plaintiffs' Exhibit No. 4 and admitted into evidence, clearly indicate that the plans, including all the specifications for the flexible surface, the materials to be used therein, and the type of construction of the facility was agreed to by Itel's Mr. Gordon Player at the time that the contract was signed by Mr. Player. The plans were also acknowledged by Chapman & Cole. Mr. DiSalvo of Itel approved only the lay-out of the site.

18. The construction of the site began in late August or early Septmber, 1980 and was completed in early January, 1981. Hammond-Treat was the subcontractor who constructed the flexible surface on the facility. The other principal subcontractor on the site was Mr. Ed Novotny's company, Dan-Tex Erectors, Inc., which prepared the foundation slab for the shop on the site and erected the shop building.

19. In late January, 1981, Itel accepted the facility and took possession of same. The Lease Contract commenced on February 1, 1981.

20. During the spring of 1980, Itel planned to have an independent contractor operate the facility on its behalf. It made a search of possible condidates and ended up deciding on CMS, Inc. a company partially owned by Robert Yuna. Mr. Yuna's company owned a container yard in Houston, Texas where Itel stored many of its containers. Much of Mr. Yuna's yard was made out of limestone, a flexible surface. Itel was very much aware of limestone flexible surfaces and how they held up to the operation of a container yard and to the weather conditions in Houston, Texas. Itel was also aware of the nature of limestone and how it could "fail" under certain conditions.

21. During the construction of the Itel facility and during the first several months after Itel took possession of same in late January, Mr. Robert Yuna, Itel's operations contractor on the facility, advised Itel that the type of flexible surface which had been designed and which was being constructed would not withstand the heavy weights that Itel was planning to put on the yard. Mr. Yuna had operated container yards in Houston for many years and was well acquainted with problems encountered with the use of flexible surfaces. Chapman & Cole was never made aware of this information. Itel was well aware of Mr. Yuna's expertise. Itel representatives ignored these warnings and advised Mr. Yuna that any repairs to the yard would be the responsibility of the landlord. This, of course was in contradiction with the express terms of the agreement between Itel and Chapman & Cole. Mr. Yuna did not know Chapman & Cole nor any of its representatives at the time. Mr. Yuna did not become acquainted with Chapman & Cole until after Itel planned to vacate the premises, some time in September, 1981. Mr. Yuna never advised Chapman & Cole, Mr. Robert Treat, nor any other individual involved with the facility (with the exception of Itel) of his opinion with respect to the design and operation of the yard.

22. Itel had also initially advised Chapman & Cole that a "top" forklift would be utilized in the yard of the facility and a "bottom" forklift would be utilized in the shop areas. The use of a "top" forklift would preclude damage to the flexible surface caused by the tynes of a "bottom" forklift. Before the facility opened in early February, 1981, Itel was not able to take possession of a "top" lift it had ordered from Mustang Equipment, Inc., because Itel had miscalculated the lifting capacity of the top lift. Therefore, Itel utilized a much heavier piece of equipment, a Calmar "bottom" lift during the entire time that the Itel facility was open. This forklift weighed approximately 48,000 lbs.

23. In late January, 1981, Chapman & Cole allowed Itel to take possession of the site before the official commencement date of the Lease Contract on February 1, 1981. During the first weekend, some 1200 containers were moved onto the yard. During

the first month of operation, failures in the yard's surface appeared. These failures appeared as small holes which gradually developed into larger holes during the constant, heavy operations conducted on the yard. During this time and subsequent times, Itel requested that Chapman & Cole repair the failures in the yard. This, Chapman & Cole did at the expense of the subcontractor, Robert Treat, in order to keep its customer, Itel, content.

24. The official grand opening of the Itel facility took place in March, 1981. Itel invited Mr. Chapman of Chapman & Cole to be present at the grand opening. Many of Itel's corporate representatives were present as were many of its international customers. Mr. Chapman was introduced only as the Landlord of the facility while Itel advised its customers that it had planned, designed and constructed one of the most modern container facilities in the world.

25. After the facility was in operation, failures continued to appear in the flexible surface of the yard. Mr. Treat continued to make temporary repairs from February through mid-May, 1981. During this entire period of time, Itel did not attempt to make any repairs to or to maintain the yard in any manner even though the yard was put to excessive use.

26. After the grand opening of the facility in March, 1981, Mr. Robert Yuna of CMS met Mr. William Tsonis of Itel on the site to assess the problems with the flexible surface. Mr. Yuna was concerned that the yard's surface would not hold up and that he would not be able to continue his operation of the yard. Itel paid Mr. Yuna approximately $50,000 to $90,000 per month for the operation of the yard, which included repairing containers on the site.

27. In March, 1981, Mr. Howard Chapman, along with his partner, Bob Cole, met Mr. Goldade on the site. At the time, Mr. Chapman advised Mr. Goldade that the tynes of the forklifts were destroying the flexible surface of the yard and allowing water to seep into the base, thereby causing failures. Mr. Chapman further advised Mr. Goldade that Itel was not utilizing wooden rails in order to stack the containers so as to allow for proper drainage on the site and to prevent damage to the yard's surface. Mr. Goldade advised Mr. Chapman at the time "not to worry, as Itel was responsible for the maintenance of the yard." In early May, 1981, Mr. Howard Chapman, Mr. Robert Treat and numerous Itel representativs, including, Allen Goldade, Jim Steckel, Denny Bradford and others met on the yard to ascertain the causes of the failures on the flexible surface. During the meeting, Mr. Chapman and Mr. Treat inquired as to the weight of the forklifts being utilized on the site. Mr. Bradford of Itel examined one of the forklifts, however, the weight of the forklift as noted on the side of the equipment was calculated in kilos. No one present at the meeting knew how to convert kilos into pounds. Therefore, Mr. Bradford went into the office at the site to call the manufacturer of the forklift to obtain the weight of the equipment in pounds. Mr. Bradford returned to the group and advised that the forklift weighed approximately 48,000 lbs. Both Mr. Chapman and Mr. Treat reminded the Itel representatives that the yard surface had only been designed to withstand 30,000 lbs of weight and that with a 48,000 lb. forklift carrying from one to three containers, the amount of pounds exerted on the yard in any one given location could be as high as 88,000 lbs. After Mr. Chapman and Mr. Treat left the meeting, Mr. Stickel of Itel reprimanded Mr. Bradford for advising Mr. Chapman and Mr. Treat of the weights of the equipment.

28. After the May, 1981 meeting, Mr. Robert Treat advised Mr. Chapman and Itel in writing that the weight utilized on the yard exceeded the design capacity by over 214%. As of May 15, 1981, Mr. Treat refused to make any further repairs on the yard because the damage to the yard was being caused by the excessive weight of the equipment being utilized; the forklifts destroying the surface of the yard; and the manner in which the containers were stored so as to preclude proper drainage on the site.

29. Itel remained on the yard until October 1, 1981. Itel ceased to pay any rent to Chapman & Cole as of July 1, 1981. The facts indicate that for the entire time that Itel was in possession of the facility, from late January, 1981 through October 1, 1981, it failed to maintain the yard and failed to make any repairs on the yard even though its operation of the facility was damaging the flexible surface. As a result, Itel was in breach of the contract it had entered into with Chapman & Cole. It failed to operate the yard in the manner that it had originally agreed to in the Lease. Itel continued to operate the yard in a negligent fashion until it left the yard on October 1, 1981. Itel severely damaged the flexible surface of the yard, to the point that it had to be re-worked before a new tenant could take possession. Itel further damaged the shop building, the fence surrounding the yard, the gates and other areas and appurtenances of the yard.

30. The flexible surface of the yard, the shop building and all of the appurtenances of the facility were constructed by Chapman & Cole in accordance with the plans, specifications and designs approved by Itel.

31. Contrary to the charges made by Itel in its numerous counterclaims, the facts indicate that Chapman & Cole was not negligent in the construction of the yard, nor did Chapman & Cole conceal, intentionally or otherwise, any information from Itel with respect to the construction of the facility. To the contrary, it provided Itel with all the information that Itel needed or requested at any time.

32. The damage to the flexible surface was caused by the excessive weight of the equipment, the heavy traffic of the yard, the non-use of timber rails, and the obstruction of drainage.

33. In addition, this Court finds no evidence of any fraud, concealment, conspiracy, illegitimate activities nor any criminal activities on the part of the plaintiffs or any of their representatives, agents, employees or subcontractors, as defendant's have alleged throughout this litigation.

34. The facts also indicate, that after Itel vacated the premises in violation of the Lease Contract on October 1, 1981, Chapman & Cole was approached by several contractors to lease the facility; however, the flexible surface of the yard had to be repaired before operations could be continued on the yard. Chapman & Cole relet the premises to CMS, Inc., which operated on half of the yard at a time while the other half of the yard was being repaired by Chapman & Cole. During this period of time CMS paid half rent. CMS remained on the yard until 1985 when it filed Chapter 11 bankruptcy. Mr. Chapman was able to relet the yard to another contractor; however, this contractor has also become insolvent and unable to make the rent payments. The facts indicate that up until the time of trial, Chapman & Cole has made efforts to relet the yard. It has advertised in newspapers, magazines, on television and has actively sought new tenants to mitigate its damages.

35. After suit was filed in this matter by Chapman & Cole, Itel alleged that Chapman & Cole was involved with and knowledgeable of numerous criminal and illegitimate activities, all of which involved the construction of the flexible surface and the facility and which allegedly proximately caused the surface of the site to fail. Itel filed a counterclaim against Chapman & Cole alleging, *inter alia*, fraud, conspiracy, concealment, bribes and "kickbacks" on the part of Chapman & Cole employees and Chapman & Cole. Itel claimed that Mr. Norman Ehrentraut, one of Chapman & Cole's supervisors was paid "kickbacks" by Mr. Ed Novotny of Dan-Tex Erectors to "turn his head" during the construction of the surface of the facility by Mr. Robert Treat of Hammond-Treat. Itel claimed that several checks paid by Dan-Tex General Contractors, another company, to Mr. Ehrentraut in mid–1980 were proof of "kickbacks" paid to Mr. Ehrentraut to allow substandard construction on the site. The possible lack of a reasonable basis for proceeding with these rather serious claims is the subject of a separate Memorandum and Order regarding the motions for Rule 11 sanctions filed as part of this action.

36. For purposes of these Findings and Conclusions, this Court finds that Itel has failed to prove any facts upon which any inference could be raised to support any issue or claim in either its defense of this case or its counterclaim against Chapman & Cole.

## CONCLUSIONS OF LAW

1. The parties have stipulated to venue, subject matter and the in personam jurisdiction of this Court. Venue and jurisdiction are present pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1332.

2. Under Texas Law, to prevail in an action for failure to make rental payments, the lessor must prove that (1) a valid contract existed between the lessor and lessee; (2) that the lessor had a right under the contract to receive rental payments from the lessee; (3) that the lessee breached the contract; and (4) that because of that breach lessor suffered damages. *Harry Hines Medical Center, Ltd. v. Wilson*, 656 S.W.2d 598 (Tex.App.–5 Dist.1983).

3. In the present action, the parties have stipulated to the fact that they executed a valid ten-year industrial lease. The lease agreement is clear as to Itel's obligation to make monthly rental payments of $11,101.67 to Chapman and Cole. Furthermore, this Court finds that the above findings of fact support the conclusion that Itel breached the lease agreement. In addition, there is no question that as a result of Itel's breach Chapman and Cole suffered damages. The remaining question, however, is one that this Court finds is not as easy to answer: What amount of damages may Chapman and Cole rightfully recover?

4. Paragraph 13 of the lease agreement provides Chapman and Cole with a remedy for Itel's breach. The parties, however, clearly did not intend for this to be the exclusive remedy, because subsection C of that paragraph permits the lessor to pursue any other remedy available under the law. *See Bifano v. Young*, 665 S.W.2d 536 (Tex.App.—13 Dist.1983).

5. Notwithstanding, the lease agreement does provide Chapman and Cole with a basis to recover the losses it suffered prior to the time of this trial. Plaintiffs' established their entitlement to past losses and damages through the testimony of Mr. Howard B. Chapman. At the trial, Itel failed to put forth any evidence to contest either plaintiffs' right to recover these damages or the amount of each item requested. Therefore, this Court finds that pursuant to the terms of the lease agreement, plaintiff is entitled to recover the following damages, as mitigated for credits paid by subsequent tenants, for losses suffered during the period of July 1, 1981 through April 30, 1987:

Past Rent, Insurance and Taxes

| | |
|---|---|
| Past Rent: | $155,448.43 |
| Past Insurance: | 2,136.19 |
| Past Taxes: | 6,453.27 |
| Total | $164,037.89 |

Additional Past Losses

| | |
|---|---|
| Real Estate Commission: | $50,520.40 |
| Cost of Additional Construction Requested by Itel: | $52,134.45 |
| Repair to Surface: | $279,639.81 |
| Interest on Construction Costs for Interim Financing: | $15,006.29 |
| Custom Electric Invoice Not Paid by Itel: | $1,234.78 |
| Total | $398,535.73 |

5. In addition to past losses, Chapman and Cole seeks recovery for future losses under the remaining term of the lease. Mr. Chapman testified that the following amounts represent future losses, discounted to present value, for the period covering May 1, 1987 through January 31, 1991, when the term of the lease was due to expire:

Future Losses Discounted to Present Value

| | |
|---|---|
| Future Rent: | $421,607.31 |
| Future Insurance: | 8,740.64 |
| Future Taxes: | 19,573.48 |
| Total | $449,921.43 |

6. In its response to Plaintiffs' Motion for Final Judgment, Itel has contested plaintiffs' right to recover these amounts,

claiming that plaintiffs failed to use the proper legal basis for calculating these sums. Specifically, Itel contends that plaintiffs failed to offset from the value of alleged past unpaid rent or from the present value of alleged future unpaid rents either the fair market value of the unexpired term of the lease between the parties or the full amount of payments received or to be received by plaintiffs from two subsequent leases executed between plaintiffs and third parties. Itel contends that plaintiffs' failure to compute its damages in this manner constitutes a fatal error.

7. With respect to defendant's claim that plaintiffs' have failed to reduce their request for past rents by the full amount of the payments received by subsequent tenants, this Court need only refer defendants back to the transcript of Mr. Chapman's testimony. On at least two separate occasions Mr. Chapman testified that he credited all past rent, insurance and tax losses by the amounts received from subsequent tenants. If Itel's attorneys questioned whether Mr. Chapman had credited those past losses by the full amounts received then they should have cross-examined him on that point or presented other credible evidence to disprove his testimony. Itel's attorneys did neither and, therefore, with respect to past losses no such fatal error exists.

8. With respect to future losses, however, the same cannot be said. During the trial, plaintiffs were given two opportunities to present evidence of their damages. In presenting their evidence of damages, plaintiffs relied entirely upon the testimony of Mr. Chapman. During plaintiffs' first presentation, this Court questioned plaintiffs' attorney, Mr. Sutter, about whether the future losses had been discounted to present value. Mr. Sutter informed the Court that they had not, arguing without authority that it was plaintiffs' contention that they were entitled to full contract damages. The Court advised plaintiffs to make the present value calculation.

At the close of plaintiffs' initial presentation of damages, defendants' attorney conducted a very brief and straight-forward cross examination of Mr. Chapman. In addition to inquiring as to plaintiffs' calculation of the present value of the future payments, defendants' attorney asked Mr. Chapman two very specific questions: First, whether he had calculated the reasonable cash market value of the unexpired term of the lease and; second, whether he had reduced the future losses by all amounts to be received under any subsequent lease? Mr. Chapman's response was no to both questions.

During plaintiffs' second presentation of damages, Mr. Chapman was once again plaintiffs' sole witness. Mr. Chapman's testimony was similar to the first presentation, with the exception that plaintiffs had now discounted all future losses to present value. Mr. Chapman testified that the following represented the future losses discounted to present value for the period covering May 1, 1987 through January 31, 1991:

| Future Losses Discounted to Present Value | |
| --- | --- |
| Future Rent: | $421,607.31 |
| Future Insurance: | 8,740.64 |
| Future Taxes: | 19,573.48 |
| Total | $449,921.43 |

Once again, defendants' cross-examination of Mr. Chapman was confined to two specific questions: Did Mr. Chapman calculate the reasonable cash market value of the unexpired term of the lease; or did he offset the value of the outstanding rent by all amounts to be received under a subsequent lease? Once again, Mr. Chapman's response to both questions was no.

9. Defendants' argue that plaintiffs cannot recover their damages for future losses because they failed to offset from the actual or present value of the claimed outstanding rent under the lease agreement either the amounts to be received under any subsequent lease covering the same property or the real cash value of the unexpired term of the lease. Plaintiffs respond that defendants have misrepresented the law and ignored the testimony at trial. With regard to dam-

ages for future losses, this Court cannot agree with plaintiffs' assessment.

Under Texas law, when a tenant breaches a lease by abandoning the premises and terminating rental payments, the landlord has four options. *See e.g., Crabtree v. Southmark Commercial Management,* 704 S.W.2d 478, 480 (Tex.Civ.App.—Houston [14th Dist.] 1986). The two options that apply when the landlord treats the tenant's conduct as an antitipatory breach of contract are as follows:

(2) The landlord may treat the tenant's conduct as an anticipatory breach of contract, and reposses and retain the property for his own purposes. Under that option, he can recover the present value of the rentals to accrue under the lease contract, reduced by the reasonable cash market value of the lease for the unexpired term. *Maida, supra; Speedee Mart Inc., supra.*

(3) The landlord may treat the tenant's conduct as an anticipatory breach of contract, repossess the property and lease it to another tenant. Under that option, he can recover the contractual rental reduced by the amount to be received from the new tenant. *Maida, supra; Speedee Mart Inc., supra.*

*Crabtree,* 704 S.W.2d at 480.

10. In the present action, the facts are clear that Chapman and Cole initially chose to treat Itel's conduct as an anticipatory breach of contract, repossess the property and lease it to a new tenant, Container Maintenance Service, Inc. (hereinafter "CMS"). *See* plaintiffs' exhibit 67. Under the terms of the industrial lease with CMS, CMS was to pay Chapman and Cole rent at the reduced rate of $6,000 per month while repairs were being made to the container yard. Once the repairs were completed, CMS would then pay the agreed upon monthly rental rate of $16,500 for the duration of the ten-year lease term. In addition, under the terms of the triple-net lease, CMS was also responsible for the payment of taxes and insurance.

The facts indicate that CMS paid the reduced rate of $6,000 per month from September 9, 1981, the date the lease commenced, until April 1, 1982 when the repairs were completed and CMS began paying the full monthly rent of $16,500. It is clear, therefore, that under Texas law if CMS had continued to make payments under the terms of its lease agreement with Chapman and Cole, as it had been at the time plaintiff filed this suit on November 22, 1982, then plaintiffs' recovery for rent, taxes, and insurance for the period covering April 1, 1982 through January 31, 1991 would be nothing because the total amounts "to be received" under the subsequent lease would exceed that which Itel was obligated to pay. The facts indicate, however, that this did not occur.

CMS terminated its lease payments in August of 1985 after declaring bankruptcy. After CMS vacated the premises, Mr. Chapman testified that he was able to relet the property to a subsequent tenant at a reduced rent. That tenant is apparently still on the property even though he is currently seven-months in arrears on his rent payments. Mr. Chapman also testified that he is actively attempting to find a new tenant for the property. However, Mr. Chapman indicated that all such attempts to date had been unsuccessful.

11. Plaintiff's confusion over the appropriate measure of damages for the unexpired term of the lease has been evident throughout this action. During the trial, plaintiff initially maintained that it was entitled to the full contractual amounts as damages for the unexpired term. When the Court questioned plaintiff on whether there existed authority for such an award, plaintiff agreed that it was appropriate to discount future losses to present value. Now, in its April 29, 1987 reply to Itel's Response to Plaintiffs' Motion for Final Judgment, plaintiff argues that it is entitled to recover "the contractual rental reduced by the amount to be received from the new tenants," as set forth in *Crabtree v. Southmark Commercial Management, supra.* The next paragraph in plaintiffs' reply serves as evidence of plaintiffs' lack of understanding of how these damage models operate under Texas law:

It is obvious that the defendants have ignored the testimony presented to this Court. The uncontroverted testimony of Mr. Chapman indicates that the lost rental, *both past and future suffered by the plaintiffs specifically excluded the payments of any rent by other tenants.* Further, the plaintiffs reduced all of the future lost rental to present value. The defendants have wholly ignored this evidence[*] in their response.

*See* Plaintiff's Reply to Itel's Response to Plaintiff's Motion for Final Judgment, April 29, 1987, at 2 (emphasis added). This Court finds it difficult to comprehend how plaintiffs' could have excluded from future lost rentals the payments not yet made by other tenants.

■ 12. A brief statement of the law in this area seems appropriate to clarify any misconceptions plaintiffs may have. Where the landlord choses to treat the conduct of the tenant as an anticipatory breach, retake possession and relet to a subsequent tenant, there are essentially two different measures of damages depending on the term of the subsequent lease. If the term of the subsequent lease runs concurrent with the entire term of the original lease, then the measure of damages for the unexpired term of the lease is the contractual rental reduced by the amount to be received from the new tenant. *Crabtree v. Southmark Commercial Management*, 704 S.W.2d at 480; *Maida v. Main Building of Houston*, 473 S.W.2d 648, 651 (Tex.Civ.App.—Houston [14th Dist.] 1971). However, where the landlord relets the premises for only a portion of the unexpired term the measure of damages has two components: the measure of damages for the period of reletting is the contractual rental provided in the original lease less the amount realized from reletting; *Maida v. Main Building of Houston, supra;* and the measure of damages for that period of the lease term as to which there has been no reletting is the difference between the present value of the rentals contracted for in the lease and the reasonable cash market value of the lease for its unexpired term. *White v. Watkins*, 385 S.W.2d 267 (Tex.Civ.App.—Waco 1964,

no writ); *see also Maida v. Main Building of Houston*, 473 S.W.2d at 651.

13. In the present action, it is unclear which of the above models plaintiffs have used to calculate their damages for the unexpired term of the Itel lease. On the one hand, this Court could accept plaintiffs' contention in their Reply to Defendants' Response to Plaintiffs' Motion for Final Judgment, and find that plaintiffs intended to reduce the damages for the unexpired term of the lease by the amounts to be received under the subsequent leases. After reaching this conclusion, however, this Court would then have to find that Mr. Chapman miscalculated his future losses because he failed to reduce those losses by the amounts to be received under the terms of the CMS and other lease agreements. Since this Court would be forced to find that the amounts to be realized under the terms of the subsequent leases exceed the amounts owed under the unexpired term of the Itel lease, plaintiffs' damages for future losses would be zero.

On the other hand, this Court could find from Mr. Chapman's testimony that the evidence indicates that plaintiffs will not realize any additional amounts from the CMS and other lease agreements and, therefore, this Court should treat those leases as agreements for less than the full term of the unexpired Itel lease. In this instance, the bifurcated theory of damages would apply and plaintiffs' damages for future losses would be the present value of the unexpired term less the reasonable cash market value of that term. Under this theory, however, this Court would once again have to find that plaintiffs could not recover for any future losses because they failed to put forth evidence of a critical element in their damage theory; namely, expert testimony concerning the reasonable cash market value of the unexpired term of the Itel lease. This omission seems almost unexcusable given the fact that this Court gave plaintiffs an opportunity to correct problems with their original damage model during a second presentation by Mr. Chapman and, plaintiffs were placed on notice after defendants' cross-examination during

plaintiffs' first damages presentation that such evidence might be necessary under Texas law.

In either case, this Court must find that plaintiffs have failed to meet their burden of proving the amount of damages for future losses on the unexpired term of the lease. *Johnson v. Lane,* 524 S.W.2d 361, 365 (Tex.Civ.App.—Dallas 1975). The April 29, 1987 reply to Defendant's Response to Plaintiff's Motion for Final Judgment indicates that plaintiff knew or should have known the law regarding the evidence necessary to prove their measure of damages in this action. Their failure to do so was a critical error in their attempt to recover future losses.

14. Plaintiffs also request exemplary damages in the amount of $1,000,000 and punitive damages of $50,000. This Court finds that the facts do not support an award of either exemplary or punitive damages. Therefore, this request is denied.

15. This Court finds that pursuant to the contract entered into between the parties that plaintiffs are entitled to prejudgment interest from the date of the breach of contract, July 1, 1981. The prejudgment interest rate on amounts owed plaintiffs by the defendants is ten percent (10%) *per annum.* Plaintiffs are also entitled to post judgment interest from the date of this judgment until the damages are paid.

16. Additionally, pursuant to paragraph 16.16 of the lease agreement, Tex. Civ.Prac. & Rem.Code § 38.001 and Tex. Bus. & Comm.Code § 17.50(c), plaintiffs are entitled to an award of reasonable attorneys' fees and costs incurred to enforce plaintiffs' rights under the contract. This Court finds pursuant to the twelve factors enunciated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974), that 1,200 hours represents a reasonable amount of time spent in pursuing this action and, that the $150 hourly rate charged by plaintiffs' attorneys represents a reasonable rate for this type of litigation in this community. Therefore, this Court finds that $180,000 represents a reasonable attorneys' fee for this litigation. This Court finds no basis for awarding a "Lodestar" amount of fees in this action. Addi-

tionally, this Court finds that $13,412.06 represents the reasonable and necessary expenses incurred by plaintiffs in the prosecution and defense of this matter.

## CONCLUSION

Accordingly, this Court ORDERS, ADJUDGES, and DECREES that the plaintiff, Chapman and Cole, et al., shall recover against the defendants, Itel Container B.V. and Itel Container Corporation, jointly and severally, actual damages in the amount of $562,573.62; and

Further, plaintiff shall TAKE NOTHING on its request for damages on the unexpired term of the lease agreement; and

Further, plaintiff shall TAKE NOTHING on its Request for Exemplary and Punitive Damages; and

Further, plaintiff shall be entitled to prejudgment interest at the rate of 10% *per annum* from July 1, 1981 until the date of this Judgment; and post-judgment interest at the rate of __% *per annum* from the date of this judgment to the date paid; and

FURTHER, plaintiff shall recover $180,000 in attorneys' fees and $13,412.06 as the reasonable costs and expenses of this litigation.

Counsel shall submit an appropriate final judgment incorporating by reference the above Findings of Fact and Conclusions of Law for entry by the Court within twenty (20) days.