865 F.2d 676
 13 Fed.R.Serv.3d 124, RICO Bus.Disp.Guide 7148
 CHAPMAN & COLE and CCP, Ltd., Plaintiffs-Counter Defendants,
Appellees-Cross Appellants,
v.
ITEL CONTAINER INTERNATIONAL B.V. and Itel Containers
International Corp. (ITEL), Defendants-Counter
Plaintiffs, Third Party Plaintiffs,
Appellants-Cross Appellees.
URQUHART AND HASSELL, Attorneys for Itel Container
International B.V., et al., Appellants,
v.
Norman EHRENTRAUT, Third Party Defendant-Appellee.
 No. 87-2973.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 17, 1989.
 
 Silvia T. Hassell, Edward D. Urquhart, Houston, Tex., David R. Noteware, Laurie Dore, Dallas, Tex., for Itel Container Intern. B.V.
 William G. Rosch, III, Houston, Tex., for Urquhart & Hassell.
 J. Douglas Sutter, Houston, Tex., for Chapman & Cole.
 Fritz Barnett, Mary Kay Klimesh, Houston, Tex., for Ehrentraut.
 Appeals from the United States District Court for the Southern District of Texas.
 Before GEE, SNEED* and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 This action arose over the commercial lease of a container yard. Chapman & Cole (Chapman), the landlord, brought this suit seeking recovery for failure to pay rent and failure to maintain the premises properly against Itel Container International B.V. (Itel), the tenant. Itel counterclaimed alleging that Chapman had failed to design and construct the container yard adequately and alleging a RICO violation by Chapman and one of its employees, Mr. Norman Ehrentraut.
 
 
 2
 Itel appeals the final judgment award of $562,573.62, plus costs and expenses and attorneys fees in favor of Chapman in the case-in-chief, the breach of contract claim. Itel and Urquhart & Hassel, Itel's counsel for the case-in-chief, appeal the sanctions imposed against them under Federal Rules of Civil Procedure 11, 26, and 37. Chapman also appeals two portions of the judgment: the denial of future rent damages in the breach of contract claim, and the application of the post-judgment interest rate of 7%, the rate set out in the Miller Act.
 
 
 3
 We deny Itel's and its counsels' appeals and also Chapman's appeals, affirming in its entirety the district court judgment.
 
 I. FACTS AND PRIOR PROCEEDINGS
 
 4
 Itel is in the business of owning, leasing, storing, and moving large aluminum and steel containers all over the world.[1] After deciding to establish a container yard in Houston in late 1979, Itel contacted Coldwell Banker to find an investment builder who would assist in the development and construction of a yard.
 
 
 5
 Coldwell Banker enlisted Chapman to purchase property for the site, develop it pursuant to plans and specifications approved by both Chapman and Itel, and lease the property back to Itel for a term of ten years. Itel at the end of the lease was then to have an option to purchase the yard.
 
 
 6
 Chapman purchased the property, and the yard was built through the use of subcontractors. Chapman referred Itel to Mr. Robert Treat, a "dirt/surface subcontractor," and to Mr. John Montgomery, an architect. Itel representatives met with Treat and Montgomery on numerous occasions to plan, develop, and design the facility.
 
 
 7
 During the planning stage, Itel advised Chapman and the subcontractor Treat that the maximum weight to be utilized on the yard would be 30,000 pounds.[2] The maximum amount of weight was important because the yard needed to be constructed to withstand that weight. Itel also advised them that the containers would be stacked on timber rails to allow for proper drainage and to prevent damage to the flexible surface that was chosen for the site. Pursuant to these advices, the yard was constructed.
 
 
 8
 In June of 1980, Coldwell Banker, as the agent of Itel, prepared a standard industrial/commercial lease and lease addendum that were signed by Itel as the lessee and Chapman as the lessor. The lease was later amended to state it would begin on February 1, 1981 and end on January 31, 1991. The lease and the addendum are the only written agreements between the parties. They were the subject of a joint stipulation by the parties when they were admitted into evidence at trial.[3]
 
 
 9
 Upon completion of the site in early January 1981, Itel took possession. At the grand opening of the facility in March 1981, Itel declared to the public that it had "designed the greatest facility that this type operation could possibly have."
 
 
 10
 Itel hired an independent contractor to operate the plant on its behalf. After analyzing the flexible surface material of the plant, the independent contractor informed Itel that the surface could not withstand the weight of the forklifts Itel planned to use. Itel instructed the contractor to use the forklifts as planned anyway.[4] During the first weekend of operations, 1200 containers were placed on the yard. Up to 12,000 were moved on and then off the yard in the ten months Itel had possession of the yard.
 
 
 11
 During the first month of operation, failures in the surface were already appearing. Upon request by Itel, Chapman, through its subcontractors, made the necessary repairs to the surface. Upon discovering the weights of the forklifts being used on the facility however, Chapman, as well as the subcontractors, refused to make any further repairs after May 15, 1981.
 
 
 12
 Itel ceased to pay rent on July 1, 1981, remaining on the yard until October 1, 1981. In the face of the contract obligations under the lease and despite substantial damage obviously occurring to the yard, Itel did not make repairs or maintain the yard.
 
 
 13
 After Itel vacated the property, Chapman undertook repairs. During the renovation, Chapman leased half of the property to Container Maintenance Service (CMS). After renovation, CMS occupied the entire space until 1985 when it went into bankruptcy. The property was then relet to another contractor who also became insolvent and was never able to make any rent payments. The yard has not been relet since.
 
 
 14
 On November 22, 1982, Chapman sued Itel in the United States District Court for breach of the lease. Chapman claimed that Itel's alleged use of overweight forklifts, its failure to stack containers properly, and its careless maintenance of the yard negligently damaged the yard's surface and appurtenances in breach of the lease contract.
 
 
 15
 Itel answered and counterclaimed for breach of an alleged turn-key lease, breach of warranty, negligence, and violation of the Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex.Bus. & Com.Code Ann. 17.41, et seq. Itel alleged that Chapman failed to complete the facility adequately to support Itel's normal operations; thus, Itel was constructively evicted by these deficiences.
 
 
 16
 Two years into the case, Itel amended the counterclaim, alleging violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sec. 1961, et seq., because of alleged violation of the Texas Commercial Statute, Tex.Pen.Code Ann. 32.43 (pre-1983). In its counterclaim, it joined Ehrentraut as a third party defendant. Ehrentraut was Chapman's supervisor for the Itel project. Itel dismissed its claim with prejudice against Ehrentraut the day before trial was to begin because of a settlement agreement with him.
 
 
 17
 Itel contended in the counterclaim that Ehrentraut had received "kickbacks" by a Mr. Ed Novotny of Dantex Erectors, one of the subcontractors on the project, to "turn his head" during the construction of the surface of the facility by Treat, another subcontractor. While it is clear Ehrentraut did receive at least five checks from Dantex Erectors during the time period in question, the evidence established that these checks were paid to Ehrentraut for other legitimate business transactions completely unrelated to the matter at hand.
 
 
 18
 After a trial which lasted seven days, the district court entered its findings of fact and conclusions of law. The court awarded Chapman $562,573.72 in actual damages, pre- and post-judgment interest, $13,412.06 in costs and expenses, and $180,000 in attorneys' fees. No future damages were awarded. The court also dismissed Itel's counterclaim with prejudice. Final Judgment issued on August 10, 1987.
 
 
 19
 The court characterized this case as a "straightforward action for breach of contract," in finding that Chapman had constructed the yard in accordance with the specifications prepared by Itel. It concluded that it was through Itel's failure to maintain the property that damage occurred to the property.
 
 
 20
 After trial and after a "show cause" hearing, the district court imposed sanctions against Itel and its attorneys. On July 22, 1987, the Court ordered Itel and Urquhart & Hassell to pay appellees $20,000 in sanctions, allocating $15,000 to Chapman and $5,000 to Ehrentraut. The court found that Itel and its attorneys had violated Federal Rule of Civil Procedure 11 by failing to make an objectively reasonable inquiry regarding the third party RICO action. The court further held that Itel's attorneys abused the discovery process, holding them liable under Federal Rules of Civil Procedure 27 and 36 for unnecessary discovery requests and for failure to disclose the existence of a taped conversation between one of Itel's attorneys and John Montgomery, a witness in the case.
 
 II. BREACH OF CONTRACT CLAIM
 A. Standard of Review
 
 21
 Our review of the facts is limited by the clearly erroneous rule set out in Federal Rule of Civil Procedure 52(a).[5] The court found Chapman to be an "honest and credible" witness with a "straightforward claim for breach of contract." Since the district court was in the best position to determine the nature of the parties' negotiations and understandings, basing its findings on witness credibility, we defer strongly to this finding. See Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).
 
 
 22
 As to the lease itself, the district court found the contract clear and unambiguous. Because of the absence of factual issues, our interpretation of the contract is not limited to the clearly erroneous rule. Carpenters Amended & Restated Health Ben. Fund v. Holleman Constr. Co., 751 F.2d 763, 766 (5th Cir.1985). Where there is no ambiguity, the construction of the contract evidencing the expressed intentions of the parties is a matter of law for the court, and it calls for de novo review on appeal. Austin v. Decker Coal Co., 701 F.2d 420, 425 (5th Cir.), cert. denied, 464 U.S. 938, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). The objective intentions of the parties from a review of the written language of the contract control regardless of whether it actually reflects the subjective intentions as well. Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tx.1968); see also Carpenters Amended, 751 F.2d at 766.
 
 B. The "Turn-key" Provision
 
 23
 On appeal, Itel argues that the district court's finding that this case involves a straight-forward breach of contract claim misapprehended the "turn-key" nature of the contract. Itel supports this argument by pointing out the trial court in its written opinion never addressed specifically the typewritten lease addendum that expressly required Chapman to construct the Itel facility on a "turn-key condition upon occupancy" basis so that Itel "would have the capacity to immediately commence [its] normal operations."[6]
 
 
 24
 A "turn-key" contract has a certain well-defined meaning in law and in fact. A "turn-key job is defined as 'a job or contract in which the contractor agrees to complete the work of the building and installation to the point of readiness for operation or occupancy.' " Hawaiian Independent Refinery, Inc. v. United States, 697 F.2d 1063, 1065 n. 4 (Fed.Cir.), cert. denied, 464 U.S. 816, 104 S.Ct. 73, 78 L.Ed.2d 86 (1983) (citing to Webster's Third New International Dictionary (1971 ed.)). The developer "assumes all risks incident to the creation of a fully completed facility," Securities & Exchange Commission v. Senex Corp., 399 F.Supp. 497, 500 n. 1 (E.D.Ky.1975), aff'd, 534 F.2d 1240 (6th Cir.1976), and must bear "the risk for all loss and damage to the work until its completion and acceptance." Chemical & Industrial Corp. v. State Tax Com., 11 Utah 2d 406, 360 P.2d 819, 820 (1961). Itel's "normal business operations" were contractually described in both the addendum and the lease: the premises were to be used "as a depot for containers, chassis and other transportation equipment."
 
 
 25
 While Chapman admits its obligation to build a facility capable of Itel's intended use, this admission, along with the use of the term "turn-key" in the contract, did not create a "turn-key" situation. The district court correctly looked to the entire written agreement to ascertain the meaning of the contract and did not err in disregarding the industry usage of the term "turn-key." See Chapman v. Orange Rice Milling Co., 747 F.2d 981, 983 (5th Cir.1984); see also Glassman Constr. Co. v. Maryland City Plaza, Inc., 371 F.Supp. 1154, 1158 (D.C.Md.1974).
 
 
 26
 First, Itel agreed in Section 6.3 of the lease to accept the premises "in their condition existing as of the date of the execution hereof ...," and "acknowledge[d] that neither Lessor nor Lessor's agents ha[d] made any representation or warranty as to the suitability of the Premises for the conduct of Lessee's business." Itel also agreed under Section 8.7 that Chapman:
 
 
 27
 shall not be liable for injury to Lessee's business or any loss of income therefrom or for damages to the goods, wares, merchandise or other property of Lessee ... whether the said damage or injury results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part....
 
 
 28
 If Itel had wished to make Chapman liable under a turn-key contract, it would not have prepared and executed an instrument expressly relieving Chapman of liability to Itel and expressly disclaiming warranty as to the suitability of the premises to Itel's business. As the court in Glassman pointed out:
 
 
 29
 Ordinarily the industry understanding of the term [turn-key] would be controlling.... However, in the instant contract the term was expressly defined as requiring compliance with the tenant's lease requirements and bearing all costs, therefore controlling over the industry usage.
 
 
 30
 371 F.Supp. at 1158 (citations omitted).
 
 
 31
 In Hawaiian Independent Refinery, supra, a case similar in its fact to the case before us, the court chose to look past the label "turn-key" to conclude that the owner's active participation in the "makeup of the contract plans and specifications" and the disclaimer of liability on the part of the contractor demonstrated that the parties' agreement was not a turn-key contract. 697 F.2d at 1067-68. Itel, while not the owner of the property, participated in both of the described similar relevant activities.[7]
 
 
 32
 Choosing not to apply the common industry meaning of "turn-key," the district court found the contract a lease agreement without deeming any of the contract provisions inconsistent. The court held that Chapman presented Itel with a facility that conformed to the specifications that both parties had agreed could handle Itel's normal business operations. It was correct, therefore, for the court to find that the destruction of the property resulted from Itel's misrepresentations of what constituted "normal business operations" coupled with the misuse by Itel of the property. In sum, Itel breached the contract.
 
 
 33
 We agree with the application of the law of contract by the district court. But the result is the same even if "turn-key" in the common usage had been the general intent of the parties. Contracting parties retain the right to "allocat[e] the risks among themselves as they see fit" in the "turn-key" situation. See Martin v. Vector Co., 498 F.2d 16, 25 (1st Cir.1974); see also, Mobile Housing Environments v. Barton & Barton, 432 F.Supp. 1343 (D.C.Colo.1977). As the Court in Mobile Housing Environments concluded, "the term 'turn-key construction job' ... imposes upon the contractor the responsibility for providing the design of the project and responsibility for any deficiencies or defects in design, except to the extent that such responsibility is specifically waived or limited by the contract documents." 432 F.Supp. at 1346 (emphasis added). Here the other provisions in the lease relieve Chapman of any possible liability regardless of the meaning of "turn-key" in the contract.
 
 C. Liability of Itel Under Contract Law
 
 34
 Itel argues that the district court misperceived the relationship between Chapman and Itel even if the court correctly found the contract not to be the usual turn-key construction contract. Itel claims that as the general contractor, Chapman was responsible for design deficiencies. See Emerald Forest Utility Dist. v. Simonsen Constr. Co., 679 S.W.2d 51, 52-53 (Tex.App.--Houston [14th Dist.] 1984, writ ref'd n.r.e.). While the general rule might hold general contractors liable, it is inapplicable to the facts in this case. See United States v. Spearin, 248 U.S. 132, 137, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918). See also Newell v. Mosley, 469 S.W.2d 481, 483 (Tex.Civ.App.--Tyler 1971, writ ref'd n.r.e.). The Supreme Court in Spearin states:
 
 
 35
 ... if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work, as is shown by Christie v. United States, 237 U.S. 234, 35 Sup.Ct. 565, 59 L.Ed. 933; ... where it was held that the contractor should be relieved, if he was misled by erroneous statements in the specifications.
 
 
 36
 Id. (some citations omitted). Chapman carried out the construction according to the plans prepared by Itel and mutually approved. Chapman cannot be held responsible for defects in those plans.[8]
 
 
 37
 Chapman did not breach the contract. Rather, Itel breached it by failing to pay rent, by failing to make repairs as it had contracted to do, and by vacating the premises. The district court correctly awarded damages to Chapman for Itel's breach of the contract.
 
 
 38
 III. ALLEGED IMPROPER RELIANCE BY THE DISTRICT COURT ON
 
 
 39
 EXTRAJUDICIAL KNOWLEDGE OF THE UNDERLYING FACTS
 
 
 40
 Itel claims the trial court relied upon personal knowledge of matters outside the trial record, which allegedly circumvented the administration of justice.
 
 
 41
 While it is clear the judge made several comments throughout the trial which implied knowledge of the construction industry, Itel fails to show any improper reliance on that knowledge by the trial judge or any prejudice to its case by any possible improper reliance. Price Bros. Co. v. Philadelphia Gear Corp., 649 F.2d 416, 420 (6th Cir.), cert. denied, 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981). This Court discussed the role of a trial court judge in the handling of a protracted bench trial in Ruiz v. Estelle, 679 F.2d 1115, 1129 (5th Cir.1982), cert. denied, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). We said:
 
 
 42
 Though the trial judge must be neutral, he should not be a passive spectator ... He may, when in his sound discretion he deems it advisable, comment on the evidence, question witnesses, elicit facts not yet adduced or clarify those previously presented, ...
 
 
 43
 Itel fails to show where the district judge moved beyond his proper role or how Itel was prejudiced. As the finder of fact, a judge must rely upon his or her experience and common sense. No more was involved here.
 
 IV. THE IMPOSITION OF SANCTIONS AGAINST ITEL
 A. Rule 11 Sanctions
 
 44
 The correct standard for reviewing a courts' imposition of sanctions under Fed.R.Civ.P. 11 on both questions of fact and questions of law is abuse of discretion. Thomas v. Capital Secur. Services, Inc., 836 F.2d 866, 872 (5th Cir.1988) (en banc). Rule 11 sanctions were imposed against Itel for asserting its RICO counterclaim.[9] The trial judge found the counterclaim without merit and part of a defensive strategy designed to make the cost of litigation so high that Chapman would be forced to abandon the fight.[10]
 
 
 45
 Itel clearly had ample opportunity to present its position. Itel received notice as early as ten months before trial that sanctions might be imposed when Chapman filed a motion to impose sanctions. Itel also was repeatedly warned throughout the trial of the possibility of sanctions. After trial, Itel was again warned when both Chapman and Ehrentraut renewed their motions for imposition of sanctions. Finally, after a show cause hearing where Itel was allowed to put on evidence, the judge decided to award sanctions.
 
 
 46
 This Court en banc recently discussed an attorney's obligations under Rule 11. Thomas, 836 F.2d at 873-76. In Thomas we held that compliance with Rule 11 requires, when signing a pleading, motion, or other document,
 
 
 47
 1) that the attorney has conducted a reasonable inquiry into the facts which support the document;
 
 
 48
 2) that the attorney has conducted a reasonable inquiry into the law such that the document embodies existing legal principles or a good faith argument 'for the extension, modification, or reversal of existing law;' and
 
 
 49
 3) that the motion is not interposed for purposes of delay, harassment, or increasing costs of litigation.
 
 
 50
 Id. at 873-74. Also, an attorney's subjective "good faith" does not protect him from Rule 11 sanctions. Robinson, 808 F.2d at 1127.
 
 
 51
 The district court found that the RICO action was based at best upon the subjective belief of Itel's attorney without enough concrete evidence to bring the cause of action, and at worst, on the improper purposes of causing delay and increasing expenses to Chapman. The district court thus had as a basis for sanctions either the first or the third affirmative duty set out in Thomas.
 
 
 52
 Itel undertook to support its RICO claim that Ehrentraut received "kickbacks" to "turn his head" during the construction of the flexible surface by initially proffering: 1) copies of five cancelled checks from Novotny and Dantex Erectors to Ehrentraut; 2) statements made by John Montgomery during a taped telephone conversation with Hassell; 3) the fact that Ehrentraut occasionally did work for Novotny as an independent contractor and was a partner in a company with Novotny; 4) the fact that Chapman confronted Ehrentraut about his involvement with Novotny; and 5) the fact that if either Novotny or Ehrentraut admitted to this scheme, they would subject themselves to possible criminal charges.
 
 
 53
 The district court found the only possible "solid" evidence at the time of the initial filing was the taped conversation between Montgomery and Hassell and the five cancelled checks. The court correctly concluded that neither amounted to proper grounds for bringing a RICO cause of action. The court heard the tape in camera after it was brought to the court's attention at the show cause hearing. The court ruled that it contained only rumors.[11] As to the checks, during the trial and the show cause hearing, Urquhart & Hassell was unable to point to any evidence that linked the check payments to Ehrentraut with the work performed by Treat. Rather, the evidence clearly proved that the five checks issued to Ehrentraut were for legitimate business activities that did not relate to this particular project.[12] It follows that Itel's counsel filed the complaint based on unverified hearsay--not a sufficient basis upon which to "subject one to the burdens of complex litigation and heavy legal costs." See Miller v. Schweickart, 413 F.Supp. 1059, 1061 (S.D.N.Y.1976). A RICO cause of action by definition involves complex litigation and high legal costs.
 
 
 54
 Itel and its counsel now try to argue that they were precluded at trial from discussing the RICO issue since the suit against Ehrentraut was never tried; thus, they argue they were never given the opportunity to prove their claim. They were given numerous opportunities to do so during cross-examination, however, and they had fair warning that sanctions might be imposed if additional evidence in support of their claim was not forthcoming. At a pretrial conference, the trial court warned Itel of the weakness of the RICO claim. Itel responded that there was plenty of evidence, but when the court asked Itel to produce that evidence within 60 days, none was provided. Itel also failed at the show cause hearing to supply any additional information on the objective reasonableness of its pleading.
 
 
 55
 Finally, it should be noted that an attorney's responsibility to conduct a reasonable prefiling investigation is particularly important in RICO claims:
 
 
 56
 Given the resulting proliferation of civil RICO claims and the potential for frivolous suits in search of treble damages, greater responsibility will be placed on the bar to inquire into the factual and legal bases of potential claims or defenses prior to bringing such suit or risk sanctions for failing to do so.
 
 
 57
 Black & Magenheim, Using the RICO Act in Civil Cases, 22 Hou. Law. 20, 24-25 (Oct.1984). See also Fahrenz v. Meadow Farm Partnership, 850 F.2d 207 (4th Cir.1988).
 
 B. Rules 26 and 37 Sanctions
 
 58
 The district court found that in connection with the RICO claim, Itel's attorneys also abused the discovery process. The district court stated its awareness of the superior resources of Itel. It then found evidence of an attempt to innundate Chapman with unnecessary discovery requests to raise the cost of the litigation to a point that Chapman would be forced to "give up without a fight" because of the expense. 665 F.Supp. at 1284. In particular, the court found that the discovery conducted by Itel's attorneys "was unreasonable, unnecessary, and unduly burdensome" in violation of Rule 26(g).[13] The court also found that, in violation of Rule 37(a)(3), Itel improperly failed to disclose the existence of the taped telephone conversation between Hassell and Montgomery in Itel's response to an interrogatory.[14]
 
 
 59
 Under 26(g), Urquhart & Hassell was under a duty similar to the duty under Rule 11 to make a reasonable inquiry into the basis of the action:The duty to make a 'reasonable inquiry' is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. It is an objective standard similar to the one imposed by Rule 11 ... Ultimately what is reasonable is a matter for the court to decide on the totality of the circumstances.
 
 
 60
 Fed.R.Civ.P. 26(g) Advisory Committee is note (1983). The record clearly reflects extensive discovery by Itel. Urquhart & Hassell deposed Lestor Schalit, Ehrentraut, Brent Warren, J.E. Lewis, and John Montgomery. In addition, it deposed Treat on three different occasions and Chapman twice. The court found the discovery burdensome in light of the continued lack of any additional evidence. This finding did not abuse the judge's discretion.
 
 
 61
 The failure to inform opposing counsel of the tape also warranted sanction. The failure amounted to an incomplete response to an interrogatory question.[15] An incomplete response is sanctionable and is considered to be evasive under Rule 37.[16] See Dollar v. Long Mfg., N.C., Inc., 561 F.2d 613, 616-17 (5th Cir.1977), cert. denied, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978).
 
 
 62
 Itel and its counsel claim that they were not under a duty to reveal the tape since it constitutes work product. For two reasons this contention cannot prevail. First, the clandestine taping of a telephone conversation implicitly waives the protection of the work product doctrine because it violates the American Bar Associations's Model Rules of Professional Conduct. See Parrott v. Wilson, 707 F.2d 1262, 1270-72 (11th Cir.), cert. denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). Second, Itel should have filed a work product objection within 30 days of receipt of the interrogatory to preserve the objection. Fed.R.Civ.P. 33. Its failure to do so amounted to a waiver. Thus, the trial court also correctly sanctioned Itel and its counsel under Rule 37.
 
 C. The Amount Awarded
 
 63
 The district court imposed sanctions in the amount of $20,000 on Itel and its attorneys under Rules 11, 26, and 37 without specifying the sum actually awarded under each rule. Itel and Urquhart & Hassell each were ordered to pay $10,000 of the $20,000. Ehrentraut was to receive $5,000 and Chapman was to receive the remaining $15,000. We find no abuse by the district court in the amount assessed.
 
 
 64
 First, the district court correctly determined an "appropriate" sanction under Rule 11. Once a violation was found, the judge was mandated to impose sanctions. The choice of sanction was, however, within the trial court's broad discretion. Thomas, 836 F.2d at 876. In Thomas, we listed possible types of sanctions, noting the purpose of sanctioning:
 
 
 65
 [w]hether sanctions are viewed as a form of cost-shifting, compensating opposing parties injured by the vexatious or frivolous litigation forbidden by Rule 11, or as a form of punishment imposed on those who violate the rule, the imposition of sanctions pursuant to Rule 11 is meant to deter attorneys from violating the rule.
 
 
 66
 Id. at 877 (quoting Donaldson v. Clark, 819 F.2d 1551, 1556 (11th Cir.1987) (en banc) (emphasis added). Here the trial judge chose a monetary sanction as appropriate.[17]
 
 
 67
 Itel and its counsel argue that even if monetary sanctions are appropriate under Rule 11, the amount should be reduced by the amount awarded under Rule 37. Under that Rule they can only be held responsible for the reasonable expenses caused by their failure to comply with discovery. See Batson v. Neal Spelce Associates, Inc., 765 F.2d 511 (5th Cir.1985). They assert that assessment of fees is limited only to those flowing from the specific abuses of the discovery process. See Stillman v. Edmund Scientific Co., 522 F.2d 798 (4th Cir.1975). This claim is fruitless, however, because we find the total amount awarded appropriate under Rule 11 without a finding under any other rule.
 
 
 68
 Even if Rule 11 did not cover the full amount awarded, it is clear the total amount of sanctions was also appropriate under the discovery rules. The district court clearly found Itel and its counsel to have continued unreasonably for several years the massive discovery requests after finding no additional evidence to support Itel's claim. Not one witness was produced with personal knowledge of any kickbacks. The district court cannot be said to have abused its discretion in the award of sanctions or the amount awarded.
 
 V. CLAIM FOR FUTURE RENT
 
 69
 The district court properly denied Chapman's claim for future rent for the unexpired term of the Itel lease, the period covering May 1, 1987, through January 31, 1991. The district court held that Chapman failed to offset against the value of the alleged future unpaid rent either the fair market value of the unexpired term of the lease or the amount of payments to be received by Chapman from subsequent tenants. Chapman's failure precluded under Texas law recovery of any amount for future rent. The court reached this decision by finding that Chapman chose to treat Itel's abandonment as an anticipatory breach under common law. This finding was not clearly erroneous.[18]
 
 
 70
 With the conclusion that Chapman treated the default as an anticipatory breach, the issue becomes the measure of damages. Chapman admitted at trial the applicability of Crabtree v. Southmark Commercial Management, 704 S.W.2d 478, 480 (Tex.App.--Houston [14th Dist.] 1986, writ ref'd n.r.e.), to the facts of the case. 665 F.Supp. at 1293. This assertion led both Itel and the court to conclude that Chapman was seeking common law damages under section 13(c) of the lease. Crabtree sets out the common law measure of damages available to a landlord for anticipatory breach. The plaintiff must prove the present value of future rents less the present value of actual rents received or the cash market value of the property for the remainder of the lease. Id. Chapman now attempts to assert Crabtree is inapplicable.
 
 
 71
 In its petition, Chapman sued for "loss of rents." At trial, Chapman relied solely on the testimony of Howard Chapman to establish the amount of lost future rent. Chapman initially calculated these future damages based on the total amount due under the lease from July 1, 1981, to January 31, 1991. From that amount, Chapman subtracted the actual rents that had been received from subsequent tenants and discounted that sum to its present value. During cross-examination, Chapman admitted that the figure as calculated did not take into account the reasonable cash market value of the unexpired lease or the rental amounts to be received by subsequent tenants.[19]
 
 
 72
 Chapman argues that it was electing recovery of damages under Section 13(a) of the contract and not Section 13(c) as the trial court held. Chapman argues that it was entitled to do that under Section 16.11 of the contract. It asserts that while Section 13(c) "incorporated" the common law for breach by the tenant, Section 13(a) displaced and superseded the ordinary common law measures of damages. Under Section 13(a), the contract language suggests that the burden of proof on the future cash market value of the property was on Itel. Thus, Chapman argues that it did not have to reduce future rent by any amount and that it was up to Itel to produce reduction evidence. The district court, however, correctly held that under Crabtree, the burden of proof was on Chapman to prove the amount of future losses.
 
 
 73
 Further, even if Chapman were right in its assertion, Chapman still cannot prevail. Itel correctly relied on the unrefuted valuation of the unexpired term as derived from the admitted evidence of the CMS lease and subsequent leases on the property[20] for proof that the future cash market value of the property exceeded the amount due under the remainder of the lease, allowing no recovery for future rents even under Section 13(a) of the lease.[21] See Cameron v. Calhoun-Smith Distributing Co., 442 S.W.2d 815, 817 (Tex.Civ.App.--Austin 1969, no writ) (a tenant is entitled to a credit for all the rent a subsequent tenant agrees to pay for the period the subsequent tenant occupies the premises after a tenant's abandonment, regardless of whether those payments are collected or uncollected). It follows that even if Itel had the burden of proof, Itel carried that burden. Thus, we conclude that the decision of the district court on the damages awarded was without error.
 
 
 74
 VI. THE APPROPRIATE POST-JUDGMENT INTEREST RATE
 
 
 75
 Chapman argues that when jurisdiction is based on diversity of citizenship, the rate applied post-judgment should be determined by the applicable state law, which would be Texas law in this case. Under Texas law, the appropriate rate would be the contract rate of 10% per annum. Tex.Rev.Civ.Stat.Ann. art. 5069-1.05, Sec. 1(1) (Vernon 1985). We must reject this contention, however, and uphold the district court's application of 28 U.S.C. Sec. 1961 as amended.[22] Amended Sec. 1961 "replaced the directive for applying the state rate of interest with a nationwide variable rate of interest based upon a formula using the rate paid by the Government for 52-week treasury bills." Brooks v. United States, 757 F.2d 734, 740 (5th Cir.1985). Under amended Sec. 1961, the correct interest rate applicable in this case is 7% per annum.[23]
 
 
 76
 Chapman's argument that Texas law should still govern since this is a diversity case is based upon cases decided before Sec. 1961 was amended and on Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78-79, 58 S.Ct. 817, 822-23, 82 L.Ed. 1188 (1938). See Degelos Bros. Grain Corp. v. Fireman's Fund Ins. Co., 498 F.2d 1238, 1239 (5th Cir.1974) ("In a diversity case state law governs the award of interest, 28 U.S.C. Sec. 1961 notwithstanding"); Southland Life Ins. Co. v. Stone, 112 S.W.2d 336, 337 (Tex.Civ.App.--Dallas 1938, no writ). In Erie, the Supreme Court declared that federal courts exercising jurisdiction in diversity of citizenship cases should apply state law except in "matters governed by the Federal Constitution or by Acts of Congress." 304 U.S. at 78-79, 58 S.Ct. at 822-23.
 
 
 77
 Since the statutory amendment, however, the great majority of the circuit courts have held that the amended Sec. 1961 applies in diversity cases as well as other federal cases. They have specifically held that Sec. 1961 applies to "any judgment in a civil case recovered in a district court,... including actions based on diversity of citizenship". Weitz Co. v. Mo-Kan Carpet, Inc., 723 F.2d 1382, 1385-86 (8th Cir.1983) (emphasis added). See also, G.M. Brod & Co. v. U.S. Home Corp., 759 F.2d 1526, 1542 (11th Cir.1985); Roy Stone Transfer Corp. v. Budd Co., 796 F.2d 720, 723 n. 6 (4th Cir.1986); Elias v. Ford Motor Co., 734 F.2d 463, 467 n. 6 (1st Cir.1984); Drovers Bank of Chicago v. National Bank & Trust Co., 829 F.2d 20, 23 n. 3 (8th Cir.1987); Bailey v. Chattem, Inc., 838 F.2d 149, 151-53 (6th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988); International Telemeter, Corp. v. Hamlin International Corp., 754 F.2d 1492, 1494 (9th Cir.1985); Lowell Staats Mining Co. v. Pioneer Uravan, Inc., 645 F.Supp. 254, 258-59 (D.Colo.1986); Harmon v. Clark Equipment Co., 657 F.Supp. 873 (D.Me.1987); Commonwealth Edison Co. v. Decker Coal Co., 653 F.Supp. 841, 845 (N.D.Ill.1987). But see Davis & Cox v. Summa Corp., 751 F.2d 1507, 1522 (9th Cir.1985); Weitz Co., 723 F.2d at 1387-88 (dissenting opinion took the position that if Congress had intended to change the law for post-judgment interest, it would have done so more explicitly). The statute has been amended and is clear. We hold in agreement with virtually all the circuit courts that have considered the issue. Section 1961 applies to all civil cases in federal courts. No reason is found, including the terms of the statute, to find it not applicable to cases where federal jurisdiction is based upon diversity of citizenship.
 
 VII. CONCLUSION
 
 78
 We affirm the district court's judgment in full. The district court correctly decided that the contract was not a "turn-key" construction contract but rather a commercial lease. The court correctly assessed damages against Itel for breach of that contract when it vacated the premises, failed to make proper repairs, and failed to pay rent.
 
 
 79
 As to the sanctions awarded, the court correctly imposed sanctions under Fed.R.Civ.P. Rule 11 and also under the discovery rules, Fed.R.Civ.P. Rules 26 and 37. The amount imposed was reasonable and fell within the court's discretion.
 
 
 80
 As to the request for sanctions for this appeal under Fed.R.App.P. Rule 38, we are not persuaded that the imposition of sanctions is warranted. Therefore, we deny the appellees' motion for further sanctions under this rule.
 
 
 81
 Finally, the court correctly denied future rent as part of the damage award and properly awarded post-judgment interest by calculating it in accordance with the amended 28 U.S.C. Sec. 1961.
 
 
 82
 AFFIRMED.
 
 
 
 *
 Circuit Judge of the Ninth Circuit, sitting by designation
 
 
 [1]
 Itel is the fourth largest container company in the world. Itel utilizes various container yards in the United States, including yards in Chicago, Detroit, Houston, Los Angeles, Memphis, Oakland, Portland, and Seattle
 
 
 [2]
 Itel contends that it is understood in the container business that 30,000 pounds refers to the lift capacity and not the gross weight as Chapman assumed. Itel further contends that even if 30,000 pounds referred to the gross weight, the surface still would not have been able to withstand the weight
 
 
 [3]
 The relevant sections of the lease can be found in the district court opinion, Chapman & Cole v. Itel Container International, 665 F.Supp. 1283, 1286-88 (S.D. Texas 1987)
 
 
 [4]
 Itel initially advised Chapman that a "top" forklift would be utilized in the yard to preclude damage to the flexible surface that would be caused by the tynes of a "bottom" forklift. However, Itel only had the "bottom" forklifts on hand upon the opening of the plant so that they had to be used. These forklifts weighed approximately 48,000 pounds and could exert as much as 80,000 pounds of weight on any given location. This weight was 214% greater than the maximum 30,000 pound weight for which the container yard had been designed
 
 
 [5]
 Rule 52(a) governs findings of fact in bench trials:
 Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.
 Fed.R.Civ.P. 52(a).
 
 
 [6]
 While the court never mentions the term "turn-key" in its opinion, it is clear that the court was aware of the provision because of the many references by the court to the addendum. We must conclude that the court chose to disregard the general industry usage meaning of the term in its conclusions
 
 
 [7]
 Itel tries to distinguish Hawaiian Independent Refinery on the basis that Itel did not own the property. The reasons for holding the owner liable in Hawaiian Independent Refinery, however, are applicable to Itel. Itel clearly had the upper hand in bargaining, had the right to purchase the property at the end of the lease, and initiated and conducted the arrangements between the parties
 
 
 [8]
 Itel also argues that Chapman breached the implied warranty of suitability that was recently recognized by the Texas Supreme Court in Davidow v. Inwood North Professional Group Phase I, 747 S.W.2d 373, 377 (1988). The warranty requires "at the inception of the lease [for] there [to be] no latent defects in the facilities that are vital to the use of the premises for their intended commercial purpose and that these essential facilities will remain in a suitable condition." Id. What Itel fails to point out is in the very next sentence of the opinion, the Texas Supreme Court recognizes that "the parties to a lease [may] expressly agree that the tenant will repair certain defects, [and] then the provisions of the lease will control." Id. Itel expressly agreed to be responsible for repairs and for any defects in the premises
 
 
 [9]
 Rule 11 provides that the signature of an attorney is a certificate that the signer had read the pleadings, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after a reasonable inquiry it is well grounded in fact and warranted by existing law ... and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. Fed.R.Civ.P. 11
 
 
 [10]
 The district court also held Itel violated Rule 11 by failing properly to review and reevaluate its position as the case developed. Prior to Thomas, this Court did impose a continuing duty on attorneys to review and reevaluate their position as their case continued. In Thomas, we determined that there are other rules to handle a developing duty such as Rule 26(g) for abuse of discovery, and reevaluation is not necessary under Rule 11. 836 F.2d at 874; See Robinson v. National Cash Register Co., 808 F.2d 1119, 1127 (5th Cir.1987). The district court erred then in holding Itel to this continuing duty although it properly relied on the Robinson holding since Thomas had not yet been decided. We, however, can uphold the sanctions as awarded since the district court awarded them under Rule 26 and 37 as well as Rule 11
 
 
 [11]
 The judge found Montgomery had no personal knowledge of the truth of the allegations. Hassell herself admitted that she did not ask Montgomery about the names, dates, places, or circumstances underlying the rumors that he had heard. Hassell thus failed to explore readily available avenues of inquiry and on that basis alone could be sanctioned for filing a factually frivolous appeal. See Calloway v. Marvel Entertainment Group, 111 F.R.D. 637, 646-47 (S.D.N.Y.1986)
 
 
 [12]
 Urquhart & Hassell again failed to follow reasonable avenues of exploration. Had it bothered to investigate before filing the suit, it would have learned Ehrentraut legitimately worked for Novotny as an independent contractor "after hours" for legitimate pay
 
 
 [13]
 Rule 26(g) provides in pertinent part:
 Every request for discovery or response or objection thereto made by a party represented by an attorney shall be signed by at least one attorney.... The signature of the attorney or party constitutes a certification that he has read the request, response, or objection, and that to the best of his knowledge, information, and belief formed after a reasonable inquiry it is: ... 2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and 3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation....
 Fed.R.Civ.P. 26(g).
 
 
 [14]
 The district court found numerous other violations as well. The judge found other internal reports of Itel that were improperly withheld, evidence of attempted intimidation of witnesses, and requests for documents that were also unduly burdensome on non-party witnesses
 
 
 [15]
 The question asked in the Chapman's fifth set of interrogatories was worded as follows:
 Interrogatory No. 4:
 Please state with specificity and particularity all of the documents, records, memoranda, written indicia and/or any other evidence, whether or not written which indicate or support the allegation that Mr. Norman Ehrentraut 'knowingly solicited and accepted benefits and payments from subcontractors involved in constructing the Itel facility on the agreement or understanding that the benefits and payments would influence the conduct of third party defendant in relation to the affairs of his employer.'
 Itel's answer was:
 Answer:
 Copies of cancelled checks evidencing payments from E.J. Novotny and Dantex Erectors are attached hereto.
 
 
 [16]
 Additionally, the failure to disclose the existence of the tape was actionable under 26(g) because it prolonged needlessly the litigation of this claim
 
 
 [17]
 The district court did not make specific findings as to the imposition of the Rule 11 sanctions. Such findings, however, are not required in all cases. As we said in Thomas,
 If the sanctions imposed are substantial in amount, type, or effect, appellate review of such awards will be inherently more rigorous; such sanctions must be quantifiable with some precision. Therefore, justification for the Rule 11 decision in the record must correspond to the amount, type, and effect of the sanction applied.... We therefore reject a rule that would impose upon district courts the onerous and often time-consuming burden of making specific findings and conclusions in all Rule 11 cases. In doing so, it should be clearly understood that when the basis and justification for a Rule 11 decision is not readily discernable on the record, an adequate explanation by the trial court for the decision will be necessary.
 Thomas, 836 F.2d at 883. The record in this case reflects clearly the reasons behind the imposition of sanctions so that no specific findings as to amount awarded were required.
 Also, as the Fourth Circuit stated in Fahrenz,
 it is important to note that Rule 11 speaks in terms of an 'appropriate sanction.' What constitutes reasonable expenses within the context of Rule 11 must be considered in relation with the Rule's goals of deterrence, punishment, and compensation. In this respect, "reasonable" does not necessarily mean actual expenses and attorney's fees. Instead Rule 11 leaves the determination of the "appropriate sanction" to the sound discretion of the trial court....
 850 F.2d at 211. While Fahrentz addresses the specific situation of expenses as a sanction, the same reasoning applies where the court imposes sanctions that are not tied to expenses. Here, the sanction imposed is reasonable in light of the expenses involved in the litigation.
 
 
 [18]
 The district court found alternatively: 1) If Chapman intended to reduce the amount of future rent by subsequent tenants' rent, which was its contention in its Reply to Defendant's Response to Plaintiff's Motion for Final Judgment, there would be no recovery since the amount realized on subsequent leases exceeded the amount due under the Itel lease. On the other hand, (2) if the court treated Chapman as not realizing anything on the additional leases, Chapman's damages for future losses would be the present value of the unexpired term less the fair market value of the term. Again, Chapman recovers nothing because it failed to put on any expert evidence to support its claim. Under either approach, the district court held Chapman failed to meet the burden of proving the amount of damages for future losses on the unexpired term of the lease. 665 F.Supp. at 1294-95 (citing to Johnson v. Lane, 524 S.W.2d 361, 365 (Tex.Civ.App.--Dallas 1975, no writ))
 
 
 [19]
 The district court laid out the fact scenario:
 ... the facts are clear that Chapman and Cole initially chose to treat Itel's conduct as an anticipatory breach of contract, repossess the property and lease it to a new tenant, Container Maintenance Service, Inc.... Under the terms of the industrial lease with CMS, CMS was to pay Chapman and Cole rent at the reduced rate of $6,000 per month while repairs were being made to the container yard. Once the repairs were completed, CMS would then pay the agreed upon monthly rental of $16,500 for the duration of the ten-year lease. In addition, under the terms of the triple-net-lease, CMS was also responsible for the payment of taxes and insurance.... The facts indicate, however, that this did not occur.
 
 
 [665]
 F.Supp. at 1293. Itel was obligated to pay $11,101.67 under its lease, an amount far below the subsequent lease
 
 
 [20]
 CMS terminated the lease after going into bankruptcy. After retaking possession, Chapman relet it again. It appears this tenant is still on the property, but that the tenant still has not made any rent payments. 665 F.Supp. at 1293
 
 
 [21]
 Section 16.11 of the contract makes the remedies under the contract cumulative. The trial court, however, had reason for holding Chapman to an election since in its April 29, 1987 motion, Chapman specifically argued it was entitled to recover "the contractual rental reduced by the amount to be received from the new tenants, as set forth in Crabtree ..., 665 F.Supp. at 1294-95," suggesting its choice to use common law damages
 
 
 [22]
 Prior to October 1, 1982, Sec. 1961 provided generally for post-judgment interest "calculated from the date of the entry of the judgment, at the rate allowed by state law." It was amended in the Federal Courts Improvement Act of 1982, Pub.L. 97-164, Sec. 302(a), 96 Stat. 25, 55-56 (codified at 28 U.S.C. Sec. 1961(a) (Supp.1983))
 
 
 [23]
 This Court had expressly reserved this issue since the enactment of amended Sec. 1961 until today. See Bartholomew v. C.N.G. Producing Co., 832 F.2d 326, 330 n. 3 (5th Cir.1987)