**BESICORP GROUP, INCORPORATED and Bio–Energy Services, Corporation, Plaintiffs,**

v.

**THERMO ELECTRON CORPORATION and Tecogen Incorporated, Defendants and Counter-claimants.**

**No. 90–CV–434.**

United States District Court, N.D. New York.

Oct. 10, 1997.

---

Brown, Kelleher, Zwickel & Wilhelm, Charles J. Brown, Carol D. Stevens, Windham, New York, for Plaintiffs.

Couch, White, Brenner, Howard & Feigenbaum, Paul A. Feigenbaum, Doreen M. Unis, Albany, New York, for Defendants.

## MEMORANDUM-DECISION AND ORDER

MUNSON, Senior District Judge.

Plaintiffs allege breach of contract and warranty arising out of a contract for the sale of a turnkey energy system that was designed, manufactured and installed by defendants. In their amended complaint, plaintiffs seek judgment against defendants "[j]ointly and severally for an amount yet to be determined in excess of FIFTY THOUSAND ($50,000) DOLLARS, ... for attorney's fees and for costs and disbursements of this action." *See* Amended Complaint at WHEREFORE Clause. Defendants have counterclaimed for payment of the outstanding debt on the contract, for a declaration that they are released from all obligations under the contract, and for costs associated with the instant action. The following constitutes the court's Memorandum–Decision and Order ("MDO").

## I. Findings of Fact

Plaintiffs Besicorp Group, Inc. and Bio–Energy Services Corp. ("Besco") have their principal places of business in New York. Plaintiff Bio–Energy Services Corp. is a wholly-owned subsidiary of plaintiff Besicorp Group, Inc. Defendants Thermo Electron Corp. and Tecogen, Inc. are incorporated in Delaware and have their principal places of business in Massachusetts. Tecogen, Inc. ("Tecogen") is a subsidiary of Thermo Electron Corp. In 1986, Besco executed a contract with Saint Francis Hospital ("SFH"), located in Jersey City, New Jersey, in which Besco agreed to install and operate a "total energy system" ("System") at SFH, the host site. Under the contract, Besco retained ownership of the System, and the hospital agreed to purchase from Besco the energy produced by the System. Because Besco does not itself actually design, manufacture or install energy systems, it entered into an agreement with defendant Tecogen to manufacture and install such a system at SFH.

The relationship between the parties is governed primarily by a contract that was executed after a series of discussions between representatives of Besco and Tecogen. In a letter dated February 5, 1987, Leon C. Dombrowski, President of Besco, sent to Tecogen a purchase order for the installation of a System. The order specifically was for the purchase and installation, on a turnkey basis, of a cogeneration module to be installed at Saint Francis Hospital, Jersey City, New Jersey. The purchase order, which did not state a price, was signed by Leslie T. Cadigan, a sales representative for Tecogen. On the same day that the purchase order was executed, Dombrowski also executed a Sale Agreement ("Agreement") drafted by Tecogen, which consisted of a one-page form with thirteen separately numbered paragraphs on the reverse side, entitled "Terms and Conditions of Sale" ("Terms and Conditions" or "Terms and Conditions Clause"). The Terms and Conditions portion of the Agreement contains numerous provisions governing the parties' obligations under the contract, dealing with certain issues such as delivery, installation, inspection and warranty of the System.

With respect to defining the turnkey contract, the first paragraph of the Terms and Conditions Clause provides that the

> Buyer may purchase from Seller either (a) the TECOGEN® Cogeneration Module(s) ("Cogeneration Module(s)" ("Equipment Only") sale) or (b) the Cogeneration Module(s), engineering and installation services, and all associated equipment required for installation ("Turnkey" sale). Either (a) or (b) will be referred to hereinafter as the "Equipment".

The Terms and Conditions Clause also contains a standard merger clause.[1] Furthermore, the Agreement requires that any change in the terms must be in writing and signed by both parties. The front of the Agreement contains both typed and handwritten terms, including a description of the parties and goods, price and place of delivery. Certain changes to the Terms and Conditions Clause are especially pertinent to the issues presently before the court. For instance, Besco, through its officers and agents, included a provision that stated: "Engineering design to be coordinated w/Besicorp requirements." Under a provision pertaining to the installation of the equipment, Besco crossed out a paragraph containing five enumerated exclusions from the Terms and Conditions Clause. One such provision exempted Tecogen from "any cost or expense incurred to obtain any and all licenses, permits or approvals required by any government entity or agency for installation or operation of the Equipment." The parties did not cross out or otherwise delete a provision in which Tecogen agreed to "*assist* Buyer in obtaining all licenses, permits or approvals required by any governmental entity or agency for installation or operation of the Cogeneration Module(s)." (emphasis added). The Terms and Conditions Clause also contains a warranty provision that provides, in pertinent part:

> **WARRANTY.** Except as hereinafter set forth, the Equipment is warranted for a period of six (6) months after delivery or 500 hours of operation, whichever first occurs, to be free from defects in material and workmanship. If Buyer within the warranty period notifies Seller in writing of any claimed defect in the Equipment, and if after appropriate test and inspection by Seller, the Equipment is found by Seller to be not in conformity with this warranty, Seller will at its option either repair the same or provide a replacement therefore. F.O.B. shipping point, freight prepaid. Seller's liability on its warranty shall under no circumstances exceed its cost in repairing the Equipment or in pro-

viding a replacement. Immediately after any defects in the Equipment requiring correction become known or should have been known they are to be reported and confirmed in writing by Buyer to Seller or Seller's designated representative. The foregoing warranty does not cover, and Seller makes no warranty with respect to, any defect not reported to seller within the warranty period specified above.

* * *

THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE. NO IMPLIED WARRANTY ARISING BY USAGE OF TRADE, COURSE OF DEALING OR COURSE OF PERFORMANCE IS GIVEN BY SELLER OR SHALL ARISE BY OR IN CONNECTION WITH THE SALES AGREEMENT AND/OR THE SELLER'S AND/OR BUYER'S CONDUCT IN RELATION THERETO OR TO EACH OTHER, AND IN NO EVENT SHALL SELLER BE LIABLE ON ANY SUCH WARRANTY WITH RESPECT TO ANY EQUIPMENT.

Besco interlineated the following provision under the Warranty Clause: "This warranty will be superseded by our Performance & Availability Warranty ('P & A Warranty') to be mutually agreed upon, attached hereto." A copy of the proposed warranty was attached to the Agreement. The Agreement also contained a limitation of liability clause, which stated:

> **LIMITATION OF LIABILITY.** Except for the remedies specifically provided for in this Agreement, in no event shall the Seller be liable to Buyer, whether in contract, tort (including strict liability), or otherwise, for loss of services or profits, loss of use or operation, increased expense of

---

1. "The Purchase and Sale Agreement, including these Terms and Conditions, sets forth the entire understanding of the parties and supersedes all prior agreements, communications, representations or warranties, whether oral or written."

operation or service, cost of purchased or replaced power, claims of any third parties, loss of use of capital for any special, incidental or consequential loss or damage of any kind or nature arising at any time or from any cause whatsoever.

The maximum liability of Seller to Buyer under this Agreement or arising in connection with the sale, use, operation or service of the Equipment, shall not exceed the Purchase Price of the Equipment.

The following provision was handwritten next to the above-quoted limitation of liability clause by Besco: "Except as Performance Warranty provides otherwise."

The changes to the warranty and liability clauses, along with several other changes not worth mentioning here, were initialed by Dombrowski on behalf of Besco, and Cadigan for Tecogen. Dombrowski then signed the Agreement on February 5, 1987 and sent it to Tecogen for its execution. On June 19, 1987, Jon L. Plexico, Tecogen Vice President at the time of the events in question, initialed the changes made by Besco to the Terms and Conditions page of the Agreement, but did not sign, initial or otherwise approve the P & A Warranty attached by Besco to the Agreement. The original price of the contract was $600,000, to be paid by Besco in three progress payment installments. Plexico changed the contract price from $600,000 to $627,000 to reflect the additional cost of adding hot water storage tanks. The final installment of $156,750 was due within 30 days of initial generation of power by the System. Plexico also executed a Maintenance Agreement that required Tecogen to maintain the System for a specified period of time. The Agreement was then forwarded to Besco. Upon receiving the Agreement, Steven P. Levine, then Vice President of Project Development for Besco, attempted to incorporate by reference a document entitled General Specification Number 315, which was offered by Besco as a proposal of its requirements for the manufacture, installation and operation of the System. Dombrowski initialed the change made by Levine and the changes to the contract price made by Plexico, signed the attached P & A Warranty and resigned the Agreement. Dombrowski also executed the Maintenance

Agreement. The Agreement was then returned to Tecogen.

There is no evidence in the record that the reference to Specification No. 315 and the attached P & A Warranty were initialed, signed or otherwise approved by anyone from Tecogen. Indeed, as late as July and August 1989, Besco and Tecogen were negotiating the contents of the P & A Warranty, which no representative from Tecogen had signed as of that time. As to Specification No. 315, it was drafted by Besco and circulated to Tecogen representatives before the Agreement was fully executed, but Tecogen did not expressly or impliedly assent to its inclusion in the Agreement.

The Agreement called for Tecogen to sell and install an energy system, the heart of which consisted of a CM–600 cogenerator (the "System," a prototype system that was designed and manufactured by Tecogen). Although Tecogen had previously installed many energy systems for other customers, this apparently was their first attempt to install the CM–600 cogenerator. The design, manufacture and development of the System was largely underwritten by the "Gas Research Institute," ("Institute") which paid $1 million to Tecogen to develop and test the prototype. Indeed, Besco benefited by receiving a substantially reduced purchase price as a result of the Institute's funding.

The Agreement also provided that the purchase of the System was on a "turnkey" basis. The Agreement expressly refers to the turnkey sale as including the purchase of the "Cogeneration Module(s), engineering and installation services, and all associated equipment required for installation."

On July 28, 1987, representatives from Besco, Tecogen and SFH held what has been referred to as a "kick-off" meeting. Tecogen representatives knew at the time that the contract was executed that the installation of the System would be difficult. Representatives from Besco also knew from the outset that the installation would be difficult, but neither party envisioned the myriad problems that eventually led to the System's shutdown.

One of the topics discussed at the kick-off meeting, and an issue of central importance to this case, was the need to obtain an "Air Permit to Construct" from the New Jersey Department of Environmental Protection ("NJ–DEP"). The parties knew that a permit had to be obtained *before* Tecogen could begin actual installation of the System, and that the failure to obtain the permit before beginning construction could result in substantial fines. It was agreed that Tecogen would use its engineering expertise to prepare the application and that Besco would be the application signatory. In late August 1987, Tecogen sent Besco a completed air permit application, which was duly executed and sent to NJ–DEP. Although NJ–DEP received the application in mid-September 1987, the agency did not issue the Air Permit to Construct until nearly eight months later, in April 1988. During the period in which the air permit application was pending, representatives from Tecogen diligently acted in assisting Besco to obtain the permit by contacting representatives from the NJ–DEP in order to expedite the application process. Part of the delay was due to NJ–DEP's repeated requests for additional information from Tecogen, which Tecogen appears to have provided on a timely basis. There is no credible evidence in the record that the eight-month delay was the result of any fault or negligence by Tecogen. The air permit issued by NJ–DEP also stated that the System must be equipped with Continuous Emission Monitoring Equipment ("CEM") to monitor the System's air emissions. This was the first time that any of the parties learned of the CEM equipment. Based upon their experience installing similar systems in New Jersey, Tecogen advised Besco that CEM equipment was not required when the air permit application was submitted to NJ–DEP.

The process of installing the System was complex and, factoring in the installation delays, took nearly three years to complete. The principal events constituting the installation of the System are as follows. While the air permit application was pending, Tecogen prepared engineering designs of the System and began to coordinate the installation plans with various subcontractors. In late Novem-ber 1987, SFH told Besco that the original location for installation of the System was no longer acceptable, due largely to considerations not relevant to the present discussion. The original plan was for the System to be installed in the mezzanine area of the hospital's basement. An alternative site was proposed by Besco in another area of the hospital's basement.

Meanwhile, Francis C. DiBella, a Tecogen employee and the project engineer who oversaw the design and manufacture of the System, inspected the proposed site to determine whether it was a viable alternative. DiBella concluded that it was feasible to install the System at the alternative site, but cautioned Tecogen personnel that it would make the installation process much more difficult than the original site. One of the many difficulties posed by the alternative site was the presence of high-voltage electrical components. In particular, to install the System at the alternative site, the cogenerator would have to be placed very close to what is commonly referred to by the parties as the "4160 VAC Switchgear ('Switchgear')," a substantial electrical structure that was a major component of the hospital's electrical system. DiBella knew that the applicable electrical code required a minimum 48–inch clearance between the Switchgear and any conductive surface, such as the cogenerator. DiBella also knew that the cogenerator would not have the requisite 48–inch clearance from the Switchgear, but at the time that he made initial assessment of the alternative site, DiBella envisioned that a non-conductive partition could be installed between the cogenerator and the Switchgear. He did not advise Besco representatives of these concerns.

The parties ultimately agreed upon the alternative site in the hospital's basement, despite the fact that the location substantially compounded the difficulty of the installation process. To accommodate the System to the alternative site, Tecogen revised its design and installation plans and submitted a new set of drawings to Besco and SFH in late December 1987. SFH did not approve the plans until February 1988. Shortly thereafter, NJ–DEP issued the Air Permit to Construct. Due to the delays primarily

caused by the change in the installation site and in obtaining the NJ–DEP permit, the revised schedule set a completion date in October 1988, about eight months after the original completion date of February 1988. Besco made it known to Tecogen that the delay was a cause for concern and that further delay in completing the installation could cause significant financial hardship. In late May 1988, Tecogen obtained building permits from the Jersey City Building Department and immediately thereafter began preparing the hospital site for installation of the cogenerator.

In October 1988, the cogenerator module was delivered to and installed at the hospital site. The installation was primarily supervised by DiBella, who of all the witnesses that testified in the instant case, demonstrated the most thorough knowledge of the design and installation of the System. The installation process continued well into the following year, and in July 1989, the System was connected to the hospital's electrical system.

Tecogen began the final "start-up phase" in early August 1989 when the System began to generate "full output" power. In August, the System was issued a Certificate of Safe Completion by the Jersey City Building Department after an inspection of the System's electrical components. Also during August, Besco engineers inspected the System and drew up a "punch list" of items that Tecogen was required to address before Besco took over operation of the System. During September 1989, the System underwent over 55 hours of operation under "test conditions," with representatives from both Tecogen and Besco present.

Soon thereafter, in early October 1989, the installation of the System was complete and it was capable of continuous on-line commercial operation, which facts were communicated to Besco. In completing installation of the System, Tecogen included about $30,000 of additional components which were not initially contemplated under the Agreement, but were necessary for completion of the turnkey installation at this site. Tecogen asked Besco to accept the test results obtained in September and requested the third

and final installment payment. Under the terms of the turnkey contract, the final installment payment of $156,750 was due within thirty days after initial generation of power. However, Besco refused to remit the final payment until Tecogen completed the punch list items and added several additional components to the System. The components that were the primary subject of discussions between the parties included CEM equipment valued at over $30,000, an acoustical enclosure for the cogenerator, a "blow-down" tank, and an oil reservoir. Besco, while acknowledging the System was capable of production performance, questioned whether the temporary operating permit was in force. Tecogen assured Besco that the operating permit was issued and was customarily renewable under these circumstances until such time as a final permit could be issued.

Tecogen and Besco entered a negotiation phase that lasted from about September 1989 until April 1990. The parties held a series of discussions in October and November 1989 regarding, among other topics, completion of punch list items, final inspection of the System by Besco, the P & A Warranty, unforeseen installation costs, and responsibility for the cost of installing the CEM equipment, an acoustical enclosure, a blow-down tank, and an oil reservoir. Besco continued to question Tecogen as to whether the System had the necessary permits for operation and whether those permits could be renewed on a continual basis. Indeed, in March 1990, DiBella wrote to NJ–DEP to obtain confirmation that the System could operate without the CEM equipment. The NJ–DEP confirmed that the System was safe and that the System had been issued all of the appropriate permits for safe operation. During the negotiation phase, Tecogen also substantially completed the punch list items; but the parties continued to disagree over the remaining issues, with each party insisting that the other was obligated for the cost of the remaining items in issue. Meanwhile, Besco secretly began plans to take over operation of the System.

In April 1990, Besco instituted the instant lawsuit seeking damages for breach of contract and warranty. For some time after

Besco filed this complaint, Tecogen remained at the SFH work site and continued to address some of the punch list items. Despite Tecogen's efforts to complete the punch list items and to assist Besco with obtaining the necessary permits to operate the System, Besco began to insist upon immediate compliance with its various demands, including a request for consequential damages dating back over one year. In May 1990, primarily because Besco refused to make the final installment payment, and out of concern about the unsafe operation of the System by inexperienced Besco personnel, Tecogen "disabled" the System by turning it off. When Besco learned that the System had been shut down, it retaliated by barring Tecogen employees from SFH premises. Several days later, Besco was able to restart the System, making it capable of continuous commercial operation, and sold energy generated by the System to SFH for approximately the next 17 months, constituting over 4,000 hours of operation.

In October 1991, however, SFH ordered Besco to shut the System down, largely as a result of its concerns about alleged overbilling. SFH subsequently commissioned an outside agency to review the billing system and putatively to determine whether the System posed any safety risk to hospital personnel. An engineering report, referred to as the "Morris Report," was issued in late October 1991 and concluded that the System had been installed in violation of four provisions of the National Electrical Code ("NEC"). Two of the violations are serious and prevented safe operation of the System. The first of these two violations cited in the Morris Report was the inadequate clearance between the cogenerator and the Switchgear. Instead of the requisite distance of a four foot clearance, the distance between the Switchgear and the cogenerator was only about 36 to 38 inches. The second serious violation concerns the lack of an adequate means of secondary egress from the clearance space between the cogenerator and the Switchgear. At the time Besco locked Tecogen out of the SFH worksite, it was not aware of the NEC violations.

SFH notified Besco that it could not restart the System until the issue regarding the billing was resolved and the safety violations were remedied. In December 1991, a copy of the Morris Report was sent to the Jersey City Building Department, Office of the Construction Official, which, after reviewing the report, ordered the System at SFH shut down until the NEC violations were corrected. The System has not been operated since that date.

The parties submitted widely varying evidence as to the costs to repair or replace the System. The court primarily adopts the testimony of DiBella, who is the single most-knowledgeable person as to the System, and whose testimony was the most credible.

The cost to repair the NEC violations consists of two components. To repair the insufficient clearance in front of the Switchgear will cost about $32,000. The repair consists of moving the cogenerator away from the Switchgear to create the requisite clearance. The cost includes the replacement of various metal components with removable, non-conductive components.

The repair of the insufficient secondary egress ranges from about $2,000 to $3,000 to fashion the appropriate clearance between the cogenerator end of the System and the hospital wall. Another alternative is to replace the generator portion of the System with a smaller generator, ranging in cost from about $21,000 to $37,000. The latter solution appears to be the more appropriate. Lastly, the cost to remove the System is about $95,000.

## II. Conclusions of Law

### A. Choice of Law

 The court's subject matter jurisdiction is based upon the parties' diversity of citizenship, pursuant to 28 U.S.C. § 1332. Because the parties agreed via the contract and by pre-trial stipulation to the application of Massachusetts law, the court must apply that state's substantive law. As to whether to apply state common law of contracts or the Uniform Commercial Code ("UCC"),[2] the

---

**2.** The provisions of the UCC discussed through- out this MDO are codified at Massachusetts Gen-

court concludes, and the parties do not dispute, that the contract for the acquisition of a turnkey energy system is governed by Article 2 of the UCC. Although the contract involves a mixture of goods and services, the predominant purpose of the contract was for the sale of goods. *USM Corp. v. Arthur D. Little Systems, Inc.*, 28 Mass.App.Ct. 108, 119, 546 N.E.2d 888, 894 (1989) (citations omitted) (contract for sale of turnkey computer in which nearly one-half of contract price was for services was governed by UCC); *see* Mass. Gen. Laws ch. 106, § 2–102 (West 1997); *see also Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21 (1st Cir.1993) ("Massachusetts law is consistent with the general trend to view ... mixed contracts as governed by the UCC.") (citing *City of Twin Falls*, 806 F.2d at 871); James J. White & Robert S. Summers, Uniform Commercial Code § 9–2 (4th ed. 1995) ("White & Summers").

## B. The Contract Terms

Plaintiff Besco contends that Tecogen breached the contract by failing to fulfill certain obligations pertaining to the turnkey sale. In particular, Besco alleges that Tecogen failed to provide several components that were essential to the operation of the System, failed to obtain final operating permits, and installed the System in violation of safety requirements. By way of three counterclaims, Tecogen seeks payment of the outstanding debt on the contract, a declaration that it is released from all obligations under the contract, and costs associated with the instant action. To resolve these issues, the court must first ascertain the parties' respective rights and obligations under the Agreement.

■ To ascertain the parties' obligations under the Agreement, the court must "[c]onstrue the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose." *USM Corp.*, 28 Mass.App.Ct. at 116, 546 N.E.2d at 893 (citations omitted). The court may consider extrinsic evidence relating to the background and intention of the parties and to the parties' understanding of the meaning of

the language used in the contract when that language is ambiguous. *See id.* (citations omitted).

### (1) Warranties

The court first discusses the warranties made by Tecogen. Relevant to the case at bar, an express warranty can be made either by affirmation or description. An affirmation of promise is one "made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain. ..." UCC § 2–313(1)(a). An express warranty also can be made by description. Uniform Commercial Code § 2–313(1)(b) provides that "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." As can be seen from the court's discussion below, express warranties by affirmation and description often arise from the same set of facts.

■ The Agreement contains at least one express warranty by affirmation that is relevant to the issues presently before the court. As Besco points out, the Warranty Clause contained in the Agreement expressly guarantees that the "[e]quipment is ... to be free from defects in material and workmanship." *Accord USM Corp.*, 28 Mass.App.Ct. at 119, 546 N.E.2d at 894. In its ordinary sense, the word "material" refers to the physical components of the System. *See* Webster's Ninth New Collegiate Dictionary 733 (1991). The court finds that defendant expressly warranted that the physical components of the module would be free from defects. Likewise, the court finds that the word "workmanship" as it is used in the Agreement warrants that the System would be free from defects in the quality of the manner in which it was designed, manufactured and installed. *Accord USM Corp.*, 28 Mass.App.Ct. at 119, 546 N.E.2d at 894.

■ The court next finds that the Agreement expressly warrants by description that Tecogen was obligated to provide a "turnkey" installation. In reaching this result, the

eral Laws, chapter 106, §§ 1–101, et seq. (West 1997).

court first looks to the four corners of the contract. The Agreement expressly provided for a turnkey sale and then described that type of sale as constituting engineering and installation services, all associated equipment required for the installation, as well as the cogeneration module itself. The Agreement does not contain any other reference to the turnkey sale.

Other courts have had occasion to define what constitutes a turnkey sale. In *USM Corp.*, the court discussed the general meaning of the term and how it is used in relation to describing contracts for the sale of goods, such as computers, oil and gas, and construction contracts. *USM Corp.*, 28 Mass.App.Ct. at 117–118, 546 N.E.2d at 893–94. The general use of the word "turnkey" means that a seller must complete all the work, and assume all the risk, that is necessary to turn the finished product over to the buyer. *See id.* at 117 n. 9, 546 N.E.2d at 893 n. 9. In *Chapman & Cole and CCP, Ltd. v. Itel Container Int'l B.V.*, 865 F.2d 676 (5th Cir., 1989), the court provided the following definition:

> A 'turn-key' job is defined as a job or contract in which the contractor agrees to complete the work of the building and installation to the point of readiness for operation or occupancy. The developer assumes all risks incident to the creation of a fully completed facility and must bear the risk for all loss and damage to the work until its completion and acceptance.

*Chapman & Cole*, 865 F.2d at 681 (citations and internal quotation marks omitted).

Despite the common meaning of "turnkey," however, the parties are free to expressly limit the seller's obligations and to allocate the risks as they see fit. *See id.* at 682. In the case at bar, Tecogen argues that the Agreement expressly limits the obligation to provide a turnkey sale. Paragraph three of the Terms and Conditions Clause, which is entitled "Installation Clause," lists certain obligations of Tecogen with regard to the installation of the System. Tecogen points out that the obligation to provide a turnkey sale is limited by the provision stating that Tecogen must "assist" plaintiff in obtaining licenses and permits. Tecogen concludes

from that language that the obligation to obtain the permits remained with Besco because Tecogen's obligation merely was to assist in obtaining the permits; it was not Tecogen's obligation to obtain the permits, as that responsibility remained with Besco throughout the course of the dealings between the parties. The court agrees with Tecogen that the language in the Agreement is unambiguous with respect to the parties' respective obligations in obtaining the necessary permits; the ultimate responsibility to obtain the permits remained with Besco.

Reading the Agreement as a whole, and in light of the meaning of the term "turnkey" as it is used in the Agreement and in the course of trade, the court concludes that Tecogen was required to provide a turnkey installation of the System, which included *every* aspect of the design, manufacture and installation of the System, subject only to Tecogen's limited duty to assist Besco in obtaining operating permits.

 Lastly, the court must address whether the warranties, either by affirmation or description, were limited by the terms of the Agreement. The final sentence of the Warranty Clause purports to negate any express or implied warranties not contained in the Agreement. For example, the NEC violations implicate at least the implied warranty of fitness for a particular purpose in that they render the System unusable as intended. The Agreement expressly disclaims implied warranties, and such disclaimers are generally valid if conspicuously made. UCC § 2–316(2). However, whenever possible, express warranties and the language disclaiming such warranties must be "construed … as consistent with each other." UCC § 2–316(1). This means, that "[t]o the extent that the express warranties are inconsistent with the disclaimer … § 2–316(1) requires that the express warranties be given effect." *USM Corp.*, 28 Mass.App.Ct. at 121–22, 546 N.E.2d at 895–96 (citations omitted); *Hart Eng'g Co. v. FMC Corp.*, 593 F.Supp. 1471, 1479 (D.R.I.1984). In the case at bar, the court concludes that the express warranties in the Agreement must be given effect despite any overlap with the disclaimer of any implied warranties.

### (2) P & A Warranty/Specification No. 315

The court turns to a discussion of the P & A Warranty and Specification No. 315, on which the parties place a great deal of importance. The central issue is whether those documents are part of the Agreement, and if so, what effect, if any, the terms of those documents have on the parties' respective obligations. Besco's principal reason for seeking inclusion of these documents in the Agreement is that the documents purportedly show that Tecogen was obligated to provide several components, based upon Besco's argument, that were not otherwise required under the Agreement.

■ Tecogen argues as if the issue involves a "battle of the forms" under UCC § 2–207 and insists that the attempted additions to the Agreement constitute material alterations to which Tecogen allegedly never agreed. However, § 2–207 is inapplicable because that section only applies to the *formation* of a contract and is irrelevant once the parties have reached an agreement. *Magliozzi v. P & T Container Serv. Co., Inc.*, 34 Mass.App.Ct. 591, 594, 614 N.E.2d 690, 692 (1993) ("Once agreement has been reached and performance has commenced, § 2–207 does not operate to make additional terms that are proposed unilaterally in a later writing part of the agreement." (citations omitted)). *See also* 2 Anderson, Uniform Commercial Code § 2–209:17, at 323–24 ("When a sales contract has been made, the seller cannot unilaterally modify the contract by adding in the invoice a term.")

The court finds that an enforceable agreement was reached at the time that Besco and Tecogen signed the contract. Once the agreement was reached, Besco's only hope for including the P & A Warranty and Specification No. 315 is to show that those documents were incorporated into the contract by *modification.*

Uniform Commercial Code § 2–209, which governs modification of contracts, states in relevant part:

(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

(3) The requirements of the Statute of Frauds section of this Article (section 2–201) must be satisfied if the contract as modified is within its provision.

UCC § 2–209.

In the case at bar, the Agreement contains a provision specifically precluding any change in the terms of the contract absent a writing signed by both parties. Under section 2–209, plaintiffs must show that the parties agreed in a signed writing to the inclusion of the additional documents. For the reasons discussed below, the court concludes that neither the P & A Warranty nor Specification No. 315 was made part of the Agreement, either at the time that the written contract was formed, or after it was signed by both parties by way of modification.

■ As to the P & A Warranty, that document was signed on February 5, 1987, and attached to the Agreement by Besco. A Besco representative then interlineated and initialed the following provision under the Agreement's Warranty Clause: "This warranty will be superseded by our Performance & Availability Warranty to be mutually agreed upon attached hereto." Although the P & A Warranty was attached to the Agreement returned to Tecogen for Tecogen's signature in 1987, there is no evidence that Tecogen assented to the additional warranty. A Tecogen representative initialed the language interlineated on the Agreement that referred to the P & A Warranty, but there is no credible evidence that Tecogen ever signed the P & A Warranty itself. On the contrary, the record is replete with evidence that throughout 1989 the parties still were negotiating the terms of the P & A Warranty; and Besco was attempting to get Tecogen to sign the document. Indeed, the tense of the language added to the Warranty Clause by Besco supports Tecogen's contention that the terms of the P & A Warranty had not been agreed upon at the time the Agreement was signed by both parties.

■ There is even less evidence supporting Besco's argument that Specification No.

315 was incorporated by reference into the Agreement, or that it constituted a modification of the Agreement. Although Specification No. 315 was drafted before the Agreement was signed, the only reference to the former document in the Agreement was added *after* both parties had signed the Agreement. There is no evidence that any Tecogen representative expressly or impliedly assented to its inclusion into the Agreement, and the Agreement's merger clause expressly precludes consideration of the document. Moreover, there is ample evidence that the parties did not intend Specification No. 315 to supersede Tecogen's express obligations under the terms of the Agreement. Instead, it appears that both parties envisioned Specification No. 315 as a "guideline" for the design and installation of the System. Many of the requirements contained in Specification No. 315 are consistent with the general provisions of the Terms and Conditions Clause of the Agreement, although the former document contains language that is substantially more technical and detailed than the language contained in the Terms and Conditions Clause. In particular, Specification No. 315 sought to provide a detailed description of the installation process and the operation of the System, but was viewed by Tecogen merely as a guideline for the installation and operation of the System. Some of the language in Specification No. 315 was copied from Tecogen's promotional engineering specifications for the CM–600 class cogeneration system.

For the foregoing reasons, the court finds that neither the P & A Warranty nor Specification No. 315 is part of the Agreement, either by inclusion at the time of formation, or by modification. The effect of this finding is that neither the P & A Warranty nor Specification No. 315 can serve as a basis to shift the primary responsibility for obtaining permits from Besco to Tecogen. Likewise, neither document can be used to support Besco's contention that the Agreement required Tecogen to provide the four additional

components as part of the System. On the other hand, inasmuch as the Agreement provides for delivery of the System on a turnkey basis, Tecogen was obligated to provide those four components as part of its obligation under the contract.

Having determined the parties' respective rights and obligations under the Agreement, the court turns to a discussion of the alleged breaches and damages.

### C. UCC § 2–714 Damages

■ By this court's previous Memorandum–Decision and Order, it is the law of the case that Plaintiff is precluded from recovering consequential or incidental damages. *See Besicorp Group, Inc. v. Thermo Electron Corp.*, No. 90–CV–434, 1993 WL 105163 (N.D.N.Y. Apr.6, 1993). Plaintiff, therefore, seeks damages under UCC § 2–714, which is the appropriate Code section for seeking damages after the goods are effectively accepted by the buyer. Plaintiff apparently seeks to recover for losses under both subsections (1) and (2), which provide:

(1) Where the buyer has accepted goods and given notification (subsection (3) of section 2–607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

UCC § 2–714.

Application of section 2–714 is appropriate in this instance because Besco accepted delivery of the System when defendant was barred from SFH in May 1990.[3]

■ These subsections provide different, albeit overlapping, measures of damages.

---

**3.** Thus, Tecogen's objection that plaintiff failed to reject or revoke acceptance of the System is of no moment. Whether a buyer effectively rejected or revoked goods is only relevant if the buyer has not yet accepted delivery. In the instant case, Besco acknowledges that the goods were accepted and therefore appropriately seeks to recover damages based upon UCC § 2–714, which allows a buyer that has accepted goods to, nevertheless, seek to recover certain losses.

Subsection (2), pertaining to breaches of warranty, provides the most frequently applied measure of damages in which the buyer receives the difference at the time of acceptance between "the value of the goods accepted and the value they would have had if they had been as warranted." Under this measure, the buyer is usually entitled to either the cost to repair or replace the goods. White & Summers, § 10–2(a).

■ The court concludes that section 2–714(2) does not provide a basis for Besco to recover for any breach of warranty with respect to the alleged NEC violations because the Terms and Conditions Clause of the Agreement expressly limited any warranty to "a period of six (6) months after delivery or 500 hours of operation, whichever first occurs." Besco did not notify Tecogen of the NEC violations until nearly 17 months, consisting of about 4,000 hours of operation, after Besco accepted delivery of the System. Furthermore, as discussed more fully below, the latent nature of the alleged NEC violations does not, under these circumstances, render the damages limitations clause either ineffective or unconscionable.

■ Besco tries to avoid this result by arguing that the limited warranty provision of the Agreement fails its essential purpose because the System, according to Besco, is inoperable and cannot be repaired.[4] Even if the court assumes for the sake of argument that the System cannot be repaired, there is ample precedent for concluding that the damages limitation provision of the Agreement is valid and should be read to preclude Besco's recovery of damages for the NEC violations.

In *Hart Engineering Co. v. FMC Corp.*, 593 F.Supp. 1471 (D.R.I.1984), the court rejected the plaintiff's contention that a one-year warranty limitation clause fell short of its fundamental purpose and was unenforceable pursuant to section 2–719 because the flaws in the goods were not readily discoverable within the period provided in the warranty. The court reasoned that while section 2–719 is concerned with the limitation and modification of remedies, that section does not provide a basis for invalidating a disclaimer, except to the extent that the disclaimer is inconsistent with express warranties in the contract. *Hart Engineering*, 593 F.Supp. at 1479 (citing White and Summers, Uniform Commercial Code, 431 n. 19 (2d ed. 1982) ("Since the Code does not oblige the seller to make any express warranties, limitations on such warranties should stand in the absence of inconsistency under 2–316(1).")) [5]

With respect to the validity of the damages limitations clause, the court first observes that the clause is a reasonable allocation of risk between the parties. This is especially true in the instant circumstances because both parties are commercial entities of relatively equal bargaining power, and the negotiation process was fair and conducted in a reasonable manner. *Hart Engineering*, 593 F.Supp. at 1480 (plaintiff and defendant both were commercially sophisticated) (citations omitted); *Winter Panel Corp. v. Reichhold Chemicals, Inc.*, 823 F.Supp. 963, 973 (D.Mass.1993) (damages limitation clause is not unconscionable because it is a reasonable allocation of risk between two commercial entities) (citing *Boston Helicopter Charter v. Agusta Aviation*, 767 F.Supp. 363, 374–75 (D.Mass.1991); *Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, (D.Mass. 1990); *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 374–75, 548 N.E.2d 182 (1990) (clause limiting consequential damages is a valid accommodation between commer-

---

4. Uniform Commercial Code § 2–719(2) provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act."

5. Uniform Commercial Code § 2–316(1) provides, in pertinent part:
 [W]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.
 Section 2–316 "seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty ..." UCC § 2–316, Comment 1.

cially sophisticated parties, despite the fact that the limitation clause failed its essential purpose)). Indeed, "[a]bsent a showing that the terms of a warranty are so unreasonable as to be oppressive, or that there existed some impropriety during the process of contract formation which deprived one of the contracting parties of a meaningful choice . . . the dimensions and scope of warranties are fair game for negotiation." *Hart Engineering*, 593 F.Supp. at 1480 (citations omitted).

In the present case, the allocation of risk was especially appropriate because the System was essentially a prototype model, designed, manufactured and installed by Tecogen, the value of which was substantially greater than the actual contract price. *See Winter*, 823 F.Supp. at 973 (finding that it was appropriate for the parties to allocate the risks of potential failure of a product that was a "complex, sophisticated, and at the time experimental substance") (citing *Canal Elec.*, 756 F.Supp. at 626).

■ Subsection (1) of section 2–714 is broader than subsection (2) and permits the recovery of damages for *any non-conformity* of tender as well as for breach of warranty, the amount of which is determined "in any manner which is reasonable." As to what constitutes conforming tender, Comment 2 explains

> The "non-conformity" referred to in subsection (1) includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract. In the case of such nonconformity, the buyer is permitted to recover for his loss "in any manner which is reasonable."

UCC § 2–714, Comment 2.

■ The court also is instructed as to the appropriate measure of damages by subsection (2) of UCC § 2–106, which provides that "[g]oods or conduct including any part of a performance are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract." In short, the UCC requires that performance must be *exact*. UCC § 2–106, Comment 2 (subsection (2) "is in general intended to continue the policy of requiring exact performance by the seller of his obligations as a condition of his right to require acceptance").[6] For the reasons stated below, the court concludes that section 2–714(1) is the appropriate measure of damages.

The more difficult issue facing the court is whether Besco provided the requisite *notice* to Tecogen that the goods were nonconforming. Uniform Commercial Code § 2–714(1) is applicable only if the time to revoke or reject the goods has passed, and the buyer accepts the goods and seeks damages, after giving sufficient notification, because they are not as warranted.

[18, 19] Whether notice is sufficient and timely is typically measured by the purpose for requiring notice. *Delano Growers' Coop. Winery v. Supreme Wine Co., Inc.*, 393 Mass. 666, 674, 473 N.E.2d 1066, 1072 (Mass. 1985). Section 2–607(3)(a), to which section 2–714(1) refers, provides that if tender has been accepted then "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy." Comment 4 to § 2–607 states that with regard to commercial buyers, notice is intended to encourage compromise between the parties and promote good faith in commercial dealings. *See also Delano Growers' Coop. Winery*, 393 Mass. at 674, 473 N.E.2d at 1072 ("One purpose of the notice requirement . . . is to inform the seller of a breach and allow for settlement through negotiation."). The primary reason for requiring notice is to give the seller the opportunity to make adjustments or replacements, opportunities to minimize the buyer's loss and reduce the seller's own liability. The second reason for requiring notice is to give the seller a

---

**6.** Thus, Tecogen's argument that its performance under the contract constituted "substantial completion" of the Agreement because the System was capable of commercial operation is irrelevant to Besco's request for damages under § 2–714. It is immaterial to Besco's suit for damages whether Tecogen's performance was in substantial conformity with the terms of the contract because *any* nonconformity of tender is actionable under § 2–714(1). *See Hendricks & Associates, Inc. v. Daewoo Corp.*, 923 F.2d 209, 213 (1st Cir.1991).

**102**

chance to prepare for negotiation and litigation. White & Summers, § 11–10.

■■■■■ Comment 4 also provides guidance as to what constitutes sufficient notice:

The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article *need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.*

UCC § 2–607, Comment 4 (emphasis added); *see also Nugent v. Popular Markets, Inc.*, 353 Mass. 45, 48–49, 228 N.E.2d 91, 93–94 (1967) (quoting UCC § 2–607, Comment 4). As Comment 4 illustrates, the drafters of the UCC did not intend a rigorous test to determine sufficiency of notice; it can be oral as well as written, and it need not describe every objection to the transaction. Furthermore, the Code makes it clear that notification does not have to contain a warning that the aggrieved party intends to pursue litigation. UCC § 2–607, Comment 4; White & Summers, § 11–10, at 617–18.

■■■■■ As to the timeliness of notice, "it is necessary that the buyer inform the seller within a commercially reasonable time that the buyer regards the contract or warranty as broken." *United Calif. Bank v. Eastern Mountain Sports*, 546 F.Supp. 945, 958 (D.Mass.1982). Lastly, the court observes that whether notice is sufficient and timely "depends upon the reasonableness of the buyer's behavior in the circumstances." *Delano Growers' Coop. Winery*, 393 Mass. at 675, 473 N.E.2d at 1072–73. The court now turns to a discussion of whether notice was timely and sufficient in the instant case.

Tecogen argues at great length that Besco failed to provide sufficient notice of the NEC violations within a reasonable time after Besco should have discovered the alleged nonconformities. For example, Tecogen claims that Besco should have discovered the alleged NEC violation nonconformity at about the time the System was installed at SFH because the NEC violations were patent. According to Tecogen, the proximity of the System to the Switchgear was clearly depicted on the drawings submitted to Besco and also was readily apparent to any observer upon a visual inspection of the site, to which Besco had complete access. Tecogen also points out that Besco failed to provide notice of any defect in the System within the 6 months/500 hours of operation warranty period, as expressly required by the Agreement. What Tecogen ignores, however, is the notice Besco provided with respect to the other alleged breaches, namely the four cogenerator module components and the permits. The court addresses each of these alleged breaches in turn in conjunction with a discussion of the notice requirement.

■■■■ With respect to the four cogenerator module components, the permits, and in particular the CEM equipment, the court finds that Besco provided sufficient and timely notice to Tecogen. Besco complained about Tecogen's possible breach of the turnkey sale at least as early as October 1989, shortly after Tecogen represented that the System was complete and capable of continuous online commercial operation and before Besco assumed control of the System. Specifically, in a series of letters in October 1989, Besco clearly expressed its position that Tecogen had not adequately completed the turnkey installation and its intention to declare Tecogen in default of the Agreement. The primary objections raised by Besco included the permits and additional components necessary to operate the System, including the CEM equipment, the excess noise and heat generated by the System, and completion of punch list items. Indeed, after a meeting on November 17, 1989, the parties agreed to seek a compromise; and negotiation discussions continued in earnest until April 1991, when Besco ceased negotiations and instituted the instant lawsuit. The record amply shows

that Besco notified Tecogen in October 1989 that "the transaction was troublesome and had to be watched." Indeed, the resulting course of negotiations over the following six months could not have taken place without Besco's knowledge as to the non-conformities that were the subject of those discussions. The notice given by Besco also gave Tecogen an opportunity to make adjustments to minimize the buyer's loss and reduce the seller's potential liability.

In conclusion, the court agrees with Besco that Tecogen breached the express warranty for a turnkey sale by failing to provide several essential components, including the CEM equipment. As the court concluded above, the turnkey sale imposed upon Tecogen the obligation to provide the design, manufacture and installation of the System free from any deficiencies or defects, and there is no relevant provision in the contract that relieved Tecogen of any possible liability for failing to provide these components. *See Chapman & Cole,* 865 F.2d at 682–83. Apart from whatever terms were contained in the P & A Warranty or Specification No. 315, as those documents were not part of the contract, Tecogen was obligated under the terms of the Agreement to provide the four components because they were reasonably necessary for operation of the System. Unlike the NEC violations, Besco is not precluded, by the limited warranty period, from claiming damages for Tecogen's failure to provide these extra components. The court concludes, therefore, that Besco gave adequate and timely notice to Tecogen of the alleged breaches of the contract as to the failure to provide the four components. Moreover, because Besco filed the instant lawsuit for these damages before the warranty period expired, it may recover for these damages under section 2–714(1).

 The notification provided by Besco with respect to the NEC violations took place at a much later date. Besco argues that it could not have known of the NEC violations prior to its receipt of the Morris Report in October 1991. Tecogen relies upon the drawings of the System that were submitted to Besco early on in the course of the project to support its argument that Besco had suffi-

cient notice. According to Tecogen, the non-conformity was readily apparent to any observer upon a visual inspection of the site, including Besco's own engineers who had free access to the site. Tecogen's argument misses the mark.

When Besco contracted with Tecogen for the turnkey sale of the System, Besco reasonably relied upon Tecogen to install the System in compliance with all relevant safety codes. Whether or not Besco was ultimately responsible for obtaining the necessary permits and licenses to operate the system is irrelevant in as much as the act of obtaining the permits was ministerial. The turnkey Agreement unequivocally called for Tecogen to install the System in compliance with the applicable health and safety codes, compliance with which was a prerequisite to the obtaining of the permits.

Tecogen urges the court to follow *P & F Constr. Corp. v. Friend Lumber Corp. of Medford,* 31 Mass.App.Ct. 57, 575 N.E.2d 61 (1991). In that case, the court found that the buyer of doors failed within a reasonable time to notify the seller that the goods were the wrong size. The court reasoned that the doors, wrapped in clear plastic, were readily susceptible to inspection upon receipt for such readily apparent characteristics such as size. *P & F Constr. Corp.,* 31 Mass.App.Ct. at 60, 575 N.E.2d at 64.

In the case at bar, the type of nonconformities presented by the NEC violations are not the type of readily apparent nonconformity that was presented to the court in *P & F Constr. Corp..* The terms of the turnkey sale squarely placed the duty on Tecogen to install the System in compliance with the applicable code requirements, and Besco reasonably relied upon Tecogen's knowledge and skill in installing the System in such a manner. There is no evidence in the record to suggest that Besco was obligated to conduct the type of inspection that would have been necessary to make a determination that there existed NEC violations. Indeed, Tecogen's argument essentially rewrites the turnkey Agreement and shifts to Besco the obligation to duplicate Tecogen's efforts with regard to a proper installation of the System within the safety requirements. It is unreasonable un-

der the terms of this contract to require Besco to monitor the installation of the System to the degree that would have been necessary to expose the NEC violations. Although several Besco employees had engineering expertise, the court is unable to conclude from the evidence in the record that this type of nonconformity would have been obvious to any of Besco's employees given the nature of the parties' responsibilities under the turnkey contract. Indeed, the NEC nonconformities appeared to have escaped, for some time, the eyes of state officials whose very job it was to review the drawings for compliance with NEC requirements.

Nonetheless, with respect to the NEC violations, Besco failed to give proper notice of the nonconformity within the limited warranty period provided by the Agreement. Besco assumed control of the System in 1990 when it barred Tecogen employees from the SFH facility and continued to operate the System for about one and one-half years. Although the NEC violations only came to Besco's attention with the issuance of the Morris Report, any claim for warranty damages is limited by the express terms of the Agreement. For all the reasons stated above, Besco cannot escape the 1–year warranty clause by arguing that the warranty provision fails of its essential purpose. *See Hart Engineering,* 593 F.Supp. 1471. The court cannot rewrite the Agreement, which allocated the risk between the parties, to extend indefinitely the warranty period. Thus, while the NEC violations constitute a nonconformity of goods under section 2–714(1), any recovery for damages is limited by the warranty period.

## D. Breach of Contract Damages

■ The court next addresses the issue of whether Besco was the first party to breach the contract by failing to make the final installment payment and by barring Tecogen's access to the SFH facility, effectively precluding Tecogen from performing its obligations under the contract, or whether Tecogen breached first by disabling the System. The court first observes that the issue of breach is irrelevant to a determination of damages under section 2–714. Under that

statute, a party may obtain damages for any nonconformity of the goods to the extent that the parties have not otherwise expressly agreed to limit these damages. Therefore, the issue of who first breached the contract only addresses the questions of whether Tecogen was relieved of any contractual maintenance obligations and whether Besco is liable for the remainder of the contract price.

■ Tecogen maintains that any duties it had under the Agreement were excused when Besco breached its obligations by barring Tecogen employees from entering the SFH premises to maintain or repair the System. *See Ward v. American Mutual Liability Ins. Co.,* 15 Mass.App.Ct. 98, 443 N.E.2d 1342 (1983). An uncured, material breach of a contract by one party excuses the other party's performance. *See O'Connell Management Co., Inc. v. Carlyle–XIII Managers, Inc.,* 765 F.Supp. 779 (D.Mass.1991); *see also Quintin Vespa Co. v. Construction Service Co.,* 343 Mass. 547, 179 N.E.2d 895 (1962); *Beaudoin v. Lenza,* 338 Mass. 798, 156 N.E.2d 682 (1959); *Ward v. American Mutual Liability Ins. Co.,* 15 Mass.App.Ct. 98, 443 N.E.2d 1342 (1983). Furthermore, a party whose performance under a contract is prevented by the actions of the other party to the contract is excused from further performance. *See Quintin Vespa,* 179 N.E.2d 895. The issue, then, is whether Besco's decision to bar Tecogen's employees from the SFH premises and its failure to pay the final installment were justified, or whether that action constituted a breach of the contract, and thus excused Tecogen from further performance under the contract.

■ The court observes that, as discussed above, Besco had a reasonable basis for instituting the instant lawsuit to recover for Tecogen's failure to provide conforming tender with respect to the four components. However, the parties continued their performance under the contract after Besco initiated the instant lawsuit and Tecogen continued to take reasonable, good-faith steps to resolve Besco's concerns, as addressed fully above, and complete the punch list items. Shortly thereafter, however, Tecogen turned off the System by disabling certain components that were necessary for its operation.

Nevertheless, the court concludes that the parties' inability to resolve their dispute over the four components and certain punch list items, the delay in installing the System, and Tecogen's decision to "disable" the System did not provide Besco with a reasonable basis to bar Tecogen from the SFH premises or to withhold payment of the final installment. Tecogen was, thereby, relieved of its contractual maintenance duties by Besco's unjustified act of barring Tecogen from the premises.

On the other hand, Besco's failure to remit the final installment payment constituted a breach of the Agreement. It is disingenuous for Besco to argue, on the one hand, that it withheld the final payment because of Tecogne's putative failure to deliver a commercially operable energy system and, on the other, to bar Tecogen from the SFH site and then almost simultaneously commence full operation of the System on its own.

### III. Conclusion

Based upon the foregoing, the court concludes that (1) Tecogen is liable to Besco for the four components in the amount of $30,-000; (2) Besco is liable to Tecogen for the failure to remit the final installment in the amount of $156,750; (3) Tecogen is relieved of any maintenance obligations of the System under the Agreement; (4) Besco is not liable for the cost of the miscellaneous components Tecogen added to the System during the installation process; and (5) Tecogen is not liable for any damages relating to the NEC violations, whether these costs be in the form of repair, removal or otherwise. Finally, the court instructs the Clerk of the Court to enter judgment consistent with these conclusions.

**IT IS SO ORDERED.**